UNITED STATES of America,
Plaintiff–Appellee,

v.

John WEAVER, Thomas D. Sikes,
Defendants–Appellants.

No. 88–6032.

United States Court of Appeals,
Eleventh Circuit.

July 13, 1990.

Michael Hursey, P.A., Ft. Lauderdale, Fla., for John Weaver.

Alvin E. Entin, Entin, Schwartz, Margules & Schwartz, Miami, Fla., for Thomas D. Sikes.

**1468**

Dexter W. Lehtinen, U.S. Atty., Eileen M. O'Connor, Dawn Bowen, Asst. U.S. Attys., for plaintiff–appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and KAUFMAN *, Senior District Judge.

FRANK A. KAUFMAN, Senior District Judge:

Thomas Sikes and John Weaver appeal from their convictions in the United States District Court for the Southern District of Florida and the sentences imposed upon them for conspiracy to import cocaine in violation of 21 U.S.C. § 963 and conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. We affirm.

On September 23, 1987, twenty-one defendants, including the two appellants, were indicted upon twenty-nine counts for various cocaine and marijuana offenses. The indictment contained twenty-one counts charging substantive cocaine-related offenses (Counts 1–3; 12–29). All twenty-one defendants were charged with one or more cocaine related offenses. Count One charged Sikes with conducting a criminal enterprise in violation of 21 U.S.C. § 848.[1] Count Two charged Sikes and Weaver and seventeen other defendants with conspiracy to import at least one kilogram of cocaine, in violation of 21 U.S.C. § 963. Count Three charged all defendants with conspiracy to possess with intent to distribute at least one kilogram of cocaine in violation of 21 U.S.C. § 846.[2] In addition to the cocaine counts, the indictment included eight counts charging eleven defendants, but not Sikes or Weaver, with substantive marijuana-related offenses (Counts 4–11). After certain defendants entered pleas of guilty, the case proceeded to trial against nine defendants,[3] only two of whom, Robert Bradley and Norman Speck, were charged in any of the marijuana counts. After four and one-half days of trial, the court severed the marijuana charges and continued the trial as to the nine defendants solely with respect to the cocaine charges. At the conclusion of the trial, Sikes and Weaver were found guilty under Counts Two and Three. As to the other counts in which Sikes and Weaver were charged, the jury failed to reach verdicts.[4]

Weaver was sentenced to concurrent six-year terms of incarceration in connection with his convictions upon Counts Two and Three. Sikes was sentenced to two concurrent thirty-six year terms of imprisonment in connection with his convictions upon

---

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. A superseding indictment was filed on June 8, 1988 in which, in relation to the forfeiture provisions of Count One, certain additional property not mentioned in the original indictment is specified.

2. Also, Sikes was charged in Counts Twelve, Fourteen, Sixteen and Twenty with the importation of at least one kilogram of cocaine, in violation of 21 U.S.C. § 952(a); in Counts Thirteen, Fifteen, Seventeen and Twenty-one with possession with intent to distribute at least one kilogram of cocaine, and in Count Twenty-six with distribution of at least one kilogram of cocaine, in violation of 21 U.S.C. § 841(a)(1). Weaver was charged in Counts Twelve and Fourteen with the importation of at least one kilogram of cocaine, in violation of 21 U.S.C. § 952(a), and in Counts Thirteen and Fifteen with possession of with intent to distribute at least one kilogram of cocaine, in violation of 21 U.S.C. § 841(a)(1).

3. The trial related to charges against the following nine defendants: Thomas Sikes, John Weaver, Robert Bradley, Norman Speck, Charles Craig, Herman Harley Wilson, Robert Fowlkes, Francis Scara, and Alfredo Castello. Because two other defendants were fugitives, the trial did not involve charges against them.

4. As to the remaining defendants, Speck was found not guilty as to all counts upon which he was charged; Wilson and Craig were found guilty as to Counts Two and Three; and Castello was found guilty as to Count Two. The jury failed to reach verdicts as to the remaining counts against those defendants. In addition, the jury also failed to reach verdicts with respect to any count as to defendants Bradley, Fowlkes and Scara. In a separate opinion bearing today's date, we deal with certain double jeopardy issues raised by Bradley and Speck in their attempt to bar a new trial upon the severed marijuana counts.

Counts Two and Three, those terms to run consecutively with a sentence imposed in a prior case. In addition, Sikes was fined $1,000,000.

In this appeal, the following questions are presented: (1) whether Sikes was properly prosecuted for offenses he committed during 1986; (2) whether the district court properly admitted evidence at trial relating to Sikes' 1985 offenses; (3) whether the joinder of the marijuana and cocaine offenses was proper; (4) whether there was sufficient evidence to support Weaver's convictions; (5) whether the testimony regarding certain threats constituted undue prejudice; and (6) whether Sikes' enhanced sentence was proper.

## I. EVIDENCE AT TRIAL[5]

From 1983 until May 1985, certain persons, several of whom subsequently cooperated with the government and are alleged to be unindicted co-conspirators in the aforementioned marijuana and cocaine conspiracies, smuggled marijuana by boat and plane from the Bahamas, Jamaica, and Belize into the United States. In May 1985, Sikes conspired with some of those persons to import cocaine from Columbia into the United States and became a leading figure—if not the leading figure—in that effort. That conspiracy involved, *inter alia*, arrangements for the use of Florida-based airplanes to fly cocaine on four occasions from Columbia to safe landing areas in Louisiana and Florida, and then to transport that cocaine by automobile to safe locations in Florida. Weaver was one of the persons hired and paid by Sikes to offload the planes and transport the cocaine to Florida on two of the four occasions.

## II. EVIDENCE IN THE PRETRIAL HEARING REGARDING THE PLEA AGREEMENT

In January, 1983, Sikes was convicted in the court below in an earlier case for drug-related offenses committed between 1978 and 1981. That conviction was affirmed in *United States v. Van Horn*, 789 F.2d 1492 (11th Cir.), *cert. denied*, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 255 (1986). Sikes, who was at liberty on an appeal bond in connection with certain matters in that case after the Supreme Court's said denial of a writ of certiorari, contacted, through an attorney, Alvin Entin, Special Agent Devlin of the Drug Enforcement Administration (DEA). On April 10, 1987, at a meeting with DEA Agents Devlin and Benisek, and with Sikes present, Entin stated that Sikes wanted to work with the DEA in exchange for immunity for Sikes from prosecution for three cocaine smuggling ventures in which Sikes had participated with individuals named "Carlos" and "Sammy," later further identified as Carlos Betancourt and Serviano Manga. During that meeting, the specifics of those offenses were not discussed, but there was some discussion about the years in which the offenses were committed. According to Entin, he represented that Sikes engaged in criminal activity with "Carlos" and "Sammy" in 1984 and 1985, and may have engaged in criminal conduct in 1986. According to Devlin and Benisek, the general time frame under discussion was 1981 through 1985, and the three smuggling ventures were represented to have occurred in 1984 and 1985. The latter representation was memorialized by Agent Benisek in a DEA-6 report of the meeting. Sikes stated that if the government agreed not to prosecute him for the offenses mentioned by Sikes during that April 10, 1987 meeting, he would assist the DEA in the interdiction of an importation of cocaine from Columbia which "Carlos" and "Sammy" were planning. Devlin informed Entin and Sikes that he was amenable to such an agreement subject to two conditions: 1) verification that Sikes was not currently under investigation; and 2)

---

5. The facts stated in sections I and II of this opinion are stated in accordance with the standard set forth in *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), namely, that in judging the sufficiency of the evidence, this court must view the evidence in the light most favorable to the government. Moreover, all reasonable inferences and credibility choices must be drawn in favor of the jury's verdict. *United States v. Leavitt,* 878 F.2d 1329, 1335 (11th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989).

approval of the agreement by an Assistant United States Attorney.

Benisek checked the government's NAD-DIS[6] information system to determine whether Sikes was under investigation and received a negative response.[7] Devlin discussed Sikes' proposal with Assistant United States Attorney Neil Karadbil, who had prosecuted Sikes in 1982–83, and told Karadbil that Sikes wanted immunity from prosecution for three smuggling offenses committed between 1981 and 1985 in exchange for Sikes' full cooperation with the DEA.

Subsequently, Entin drafted a proposed written agreement dated April 20, 1987, which he sent to Karadbil. The letter stated, in pertinent part:

> In return for [Sikes'] assistance, the Government has agreed that Mr. Sikes has disclosed participation in approximately three cocaine operations which took place from 1981 to 1985. With regard to these approximately three operations, the Government has agreed not to prosecute Mr. Sikes for his participation in same in any Federal Court. As each of these matters involved in some way the Southern District of Florida, your office may appropriately act in this matter.

Karadbil signed the agreement and returned it to Entin.

Between April 10 and May 13, 1987, Sikes introduced an undercover DEA agent to "Carlos" and "Sammy" in Miami. Plans were made for an airplane to fly to Columbia to pick up the cocaine on May 15th and return to Florida.

Unbeknownst to Devlin, Benisek and Karadbil, DEA Agent Mangiamele and Assistant United States Attorney Eileen O'Connor were at that time investigating Sikes' drug trafficking activities occurring after 1982. On approximately May 12, 1987, Mangiamele became aware of the agree-

ment between Sikes and the government, and notified O'Connor and Karadbil of the situation.

On May 13th or 14th, Sikes told Entin that some people in Miami knew that he was cooperating with the authorities and accused Entin of leaking the information. According to Entin, Sikes also stated that Sikes did not believe that the agreement accurately reflected the time period to be encompassed by the non-prosecution portion of the agreement. On May 14th, Entin sent Karadbil a letter stating that the original agreement contained a typographical error in that Sikes was to receive immunity from prosecution for offenses committed between 1981 and 1986, rather than 1981 through 1985.

On May 15th, the planned cocaine importation was aborted when the pilots were unable to locate the airstrip in Colombia. That same day, Sikes, who had stated that he would be readily available to assist the DEA, left Miami and the agents were unable to locate him. Sikes later claimed that he left because of a family emergency.

On May 20th, Benisek and Devlin, together with another DEA agent, Shea, confronted Sikes concerning his disappearance on May 15th. The agents did not find Sikes' explanation plausible and informed him that he was "back to square one" in terms of fulfilling his cooperation requirement pursuant to the agreement. Sikes offered to introduce the agents to a cocaine dealer named "Manny." Sikes then placed a telephone call to "Manny" and, later that day, met "Manny" alone while under surveillance by DEA agents.

On May 21st, O'Connor, Mangiamele and Mangiamele's supervisor met with Benisek and Devlin and their supervisors. O'Connor instructed the latter two agents to "debrief" Sikes as to the specifics of the three smuggling ventures Sikes had referred to on April 10th.[8] O'Connor further instruct-

---

**6.** NADDIS is the Narcotic and Dangerous Drug Information System.

**7.** That response was erroneous as information had in fact been placed into the NADDIS system reflecting that Sikes was under investigation on or about April 10, 1987.

**8.** O'Connor wanted the agents to ascertain the specifics of those offenses so that if litigation ensued and the court decided that Sikes had not breached the agreement, there would be no question about the offenses to which Sikes was entitled to receive immunity from prosecution.

ed the agents to terminate Sikes as an informant following that interview.

Benisek and Devlin met with Sikes on May 29, 1987. Sikes told those two agents that the three ventures involved Carlos Betancourt, Serviano Manga, and an individual named "Gore," that he could not remember any other persons involved in the smuggling ventures, and that the three offenses did not take place between 1981 and 1985, but instead occurred in 1985 and 1986.[9] Sikes was also questioned about "Manny."

In a letter dated June 2, 1987, Karadbil, responding to Entin's May 14th letter, stated that Entin's letter was an attempt to extend Sikes' immunity for criminal conduct falling outside the originally agreed-upon time frame. Karadbil also stated that Sikes had violated the cooperation terms of the agreement, rendering the agreement null and void.

Sikes was subsequently charged in twelve counts of the twenty-nine count indictment in this case as a result of the investigation conducted by O'Connor and Mangiamele. The criminal acts for which Sikes was so charged occurred in 1985 and 1986. Sikes filed a motion to dismiss the indictment alleging that the non-prosecution agreement covered the offenses charged in the indictment.

At the conclusion of an evidentiary hearing, the court below concluded that: (1) the parties' agreement was embodied in the letter agreement dated April 20, 1987; (2) the agreement was binding on the government; (3) Sikes had not breached the agreement; but (4) Entin's letter of May 14th constituted an attempt to modify the terms of the agreement and the government had no obligation to accept such a modification. Therefore, Sikes was entitled to immunity from prosecution for offenses committed between 1981 and 1985, but not for offenses committed in 1986. The indictment

was redacted to conform to that determination by the trial court.

In this appeal, Sikes challenges those conclusions reached by the court below.

## III. PROSECUTION FOR 1986 OFFENSES

Although Sikes acknowledged in his initial brief filed in this appeal that the record supports the district court's determination that the initial agreement of April 20, 1987 only granted immunity from prosecution for offenses committed between 1981 and 1985, in his reply brief and at oral argument in this court, Sikes asserted that the April 20, 1987 agreement is ambiguous as to whether Sikes was granted immunity from prosecution for crimes committed in 1986. Further, Sikes argues that the trial court's ruling that the May 14, 1987 letter from Sikes' counsel to the government was an attempt on Sikes' behalf to extend the period of immunity was clearly erroneous. According to Sikes, the May 14th letter was written by his attorney for the purpose of correcting a typographical error in the April 20th letter of agreement. Sikes further states that the failure of the government either to respond negatively to the May 14th letter or immediately to cease using Sikes' services as an informant estops the government from denying that the subsequent letter modified the April 20th agreement to include immunity for the year 1986. Finally, Sikes takes the position that the government's failure to respond to his counsel's letter of May 14th until after Sikes had concluded his cooperation with the DEA agents constitutes the type of egregious conduct which required the district court to impose "equitable immunity" for the year 1986, or at least to conclude that the government's failure to respond rendered the agreement ambiguous as to the year 1986. We find none of those arguments persuasive.

She also instructed the agents not to question Sikes about any offenses occurring after 1985, as she believed that Sikes had no immunity for those offenses under the agreement.

**9.** Specifically, Sikes stated that the cocaine ventures occurred in August, 1985 (360 kilograms);

February, 1986 (450 kilograms); and July or August, 1986 (500 kilograms). At O'Connor's instruction, she and Mangiamele were not advised of the specifics of Sikes' disclosures at either the April 10th or the May 29th meeting.

Both Sikes and the government agree that the April 20, 1987 letter of agreement constituted a grant of immunity in exchange for Sikes' cooperation with the government in its ongoing investigation. Federal prosecutors may enter into such agreements. *See, e.g., United States v. Harvey,* 869 F.2d 1439 (11th Cir.1989) (*en banc*). As Judge Kravitch wrote in that case, "[d]ue process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes," and courts will enforce such agreements "when the defendant or witness has fulfilled his side of the bargain." *Id.* at 1443–44 (citations omitted).

█ Determination of the extent of immunity afforded by the April 20 and May 14, 1987 letters requires the application of basic principals of contracts law. *See Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982) ("contractual analysis applies equally well to promises of immunity from prosecution"); *United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986) ("[p]rivate law interpretive principles may be wholly dispositive in an appropriate case"). *See also Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1972). A basic tenet of contract law is that a written agreement which is unambiguous on its face should be interpreted and enforced accordingly.

For example, whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of law. If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced ac-

cordingly. Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind. Such an approach is conformable not only to the policies reflected in private contract law from which it is directly borrowed, but also to constitutional concerns of fundamental fairness in "bargaining" for guilty pleas, and to the wider concerns expressed in the exercise of supervisory jurisdiction over the administration of federal criminal justice.

*United States v. Harvey,* 791 F.2d at 300 (citations omitted). Also, reformation of a written agreement is warranted only when the evidence demonstrates that the parties' mutual mistake resulted in a written document which does not accurately reflect the terms of their agreement. *See* Restatement (Second) of Contracts § 155 (1979). Consequently, reformation is generally, without more, not an available remedy where the evidence demonstrates mistake or change of mind of only one of the contracting parties. *See id.* at § 153.

█ Sikes contends that the April 20, 1987 letter of agreement is ambiguous on its face because the clear intent of both parties in the letter was to grant immunity from prosecution for "approximately three cocaine operations," not to restrict immunity to the years 1981 through 1985.[10] We disagree and conclude that the April 20th agreement limiting the grant of immunity to the period 1981 to 1985 is unambiguous.

The evidence adduced at the motions hearing showed that during the April 10th meeting, Sikes' attorney specifically re-

---

10. The government stated during oral argument before us that the 1986 criminal activity for which Sikes was indicted and subsequently convicted was not necessarily one of the "approximately three cocaine operations" for which Sikes was granted immunity. According to the government, the three narcotics transactions Sikes referred to in his May 29, 1987 debriefing do not match up with the allegations contained in the indictment with regard to the 1986 operation. For instance, at the debriefing, Sikes told the agents that the three drug ventures in which he participated and for which he sought immunity involved two individuals named Carlos Be-

tancourt and Serviano Manga. In that regard, the government points out that the indictment contains no mention of those two individuals, and that no evidence was introduced at trial regarding them. Thus, the government suggests that the 1986 offenses for which Sikes was prosecuted were not covered by the agreement because they were not part of the "approximately three narcotics transactions" covered by the April, 1987 agreement. That approach by the government, while not unpersuasive, need not be relied upon by this court in view of the evidence relied upon by the court below and which supports that court's determination.

ferred to three cocaine operations which occurred during 1984 and 1985, and that the government agreed to grant Sikes immunity from 1981 to 1985 in exchange for his cooperation. Notes taken by both sides during the meeting and a DEA report produced shortly after the meeting confirm that the agreement related to the 1981 to 1985 dates. Moreover, Sikes' attorney, who had conducted negotiations on behalf of and in the presence of his client, personally drafted the April 20th document which unambiguously stated that the cut-off date for non-prosecution was 1985. Thus, in refusing to extend immunity for the year 1986, the district court properly measured the terms of the immunity agreement "by objective standards, not the subjective beliefs of the parties." *See,* with regard to plea agreements, *United States v. Calimano,* 576 F.2d 637, 640 (5th Cir.1978); *Johnson v. Beto,* 466 F.2d 478, 480 (5th Cir. 1972). In addition, having concluded that there was no mutual mistake as to the intended scope of the contract, the district court correctly concluded that reformation was unwarranted and that Sikes' May 14, 1987 letter constituted a unilateral attempt to modify the terms of the agreement. Sikes' further contention that the government was obligated to accept the proposed modification because the government would likely have been willing in the first instance to include 1986 in the agreement is equally unpersuasive.[11] Assuming *arguendo* only that the government would have initially agreed to include 1986 in the terms of the agreement, it is irrelevant, in determining the terms actually agreed on, that either of the parties may subjectively have harbored a willingness to accept different terms. What controls is upon what the parties agreed, not upon what they did

not agree. The contract, once created, is to be interpreted in accordance with the objective import of its unambiguous terms. *See Johnson v. Beto* at 480.

Sikes' insistence that the government was obligated to accept the terms of the May 14, 1987 letter as a result of the prosecutor's failure to respond is unavailing in light of the government's letter of June 2, 1987 which expressly rejected the proposed modification.[12] Thus, even assuming that the May 14th letter can be construed as an offer to renegotiate the terms of the agreement, it did not bind the government because an offer, in the absence of an acceptance, has no legal consequence. *See Calimano,* 576 F.2d at 639–40. Nor does the fact that the government continued to use Sikes' services as an informant after the government's receipt of, but before its rejection of, the May 14th letter bind the government to renegotiate the terms of the April agreement. The doctrine of estoppel may be invoked to prevent "a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation." Restatement (Second) of Contracts, § 90 comment a. For the government to be estopped from prosecuting Sikes for crimes committed in 1986, Sikes would have to show that his cooperation after May 14th was as a result of the government's representation that he would not be prosecuted for criminal acts committed in 1986. In this case, Sikes has not presented or proffered any such evidence. Under such circumstances, a person such as Sikes may not prevail upon an alleged existence of an agreement of the type involved in this case based solely on the defendant's subjective impression that a promise had been made; instead, objective standards

11. The government has not denied that it might, at the April 10, 1987 meeting, have accepted an expansion in the scope of immunity granted to Sikes to include 1986 if that date had been requested. However, relying on principles of contract law, the district court appropriately rejected Sikes' contention that the government was subsequently obligated to extend the grant of immunity to 1986 merely because it might have agreed in the first instance to include that date.

12. The approximate two-week delay between the government's receipt of the May 14th letter and its written response on June 2nd did not operate to bind the government to its proposed terms. Such silence, in and of itself, is not tantamount to acceptance of an offer; an offeror does not have the power to cause the mere silence of an offeree to operate as an acceptance. Restatement (Second) of Contracts, § 69 comment a and c.

are utilized. *See Calimano* 576 F.2d at 640. *See also United States v. Weiss,* 599 F.2d 730, 736–38 (5th Cir.1979).[13] By contrast as to result, but in accordance with the same principles of law, this court, in *Rowe v. Griffin,* 676 F.2d at 528, affirmed the district court's dismissal of an indictment upon a *prima facie* showing that the government had promised the defendant immunity from prosecution for certain offenses in return for his cooperation and that the defendant had complied in good faith with the terms of the agreement. Applying the rationale employed in *Calimano, Weiss,* and *Rowe* to the facts of the instant case, since the government made no promises that Sikes would not be prosecuted for any offenses committed in 1986, the doctrine of promissory estoppel is of no aid herein to Sikes. *See Johnson v. Beto,* 466 F.2d at 480 (discussing promissory estoppel in a plea agreement setting).

 Sikes' contention of abuse of prosecutorial discretion and his reliance upon the doctrine of equitable immunity are similarly unpersuasive. In *Weiss,* the Fifth Circuit suggested that dismissal of an indictment may be justified in some circumstances as a matter of equitable immunity where the prosecutor abused his discretion by deciding to prosecute in the face of a promise not to do so and the defendant's resultant cooperation, where the defendant's cooperation was such that he (the defendant) should not be prosecuted, or where the government's conduct was so egregious as to offend due process. 599 F.2d at 735 n. 9. None of those reasons exists in this case. Accordingly, the prosecution for crimes committed in 1986 did not violate the government's agreement with Sikes. However, the government also prosecuted Sikes for offenses occurring prior to 1986. Those offenses were covered by the April 20th letter of agreement. That latter governmental action was based upon Sikes' alleged breach of his obligations under that agreement. When the government contests the defendant's good faith compliance with the terms of an agreement and proceeds with its case by way of indictment, the defendant is entitled to a judicial determination as to whether the government may so withdraw from the agreement. In this case, the inclusion of the 1985 offenses in the indictment called for the question of Sikes' good faith compliance with the April, 1987 agreement to be reviewed by the district court and, in and of itself, did not constitute a breach of that agreement or bad faith prosecution. When that question was presented after indictment, the court below concluded that Sikes had not breached the terms of the agreement so as to permit prosecution of him for the pre–1986 offenses. Accordingly, the indictment was redacted as to the pre–1986 offenses and Sikes received the full benefit of the April, 1987 agreement.

As to Sikes' contention that his good faith cooperation with the agreement entitles him to equitable immunity for offenses committed in 1986, that claim lacks any merit. Sikes' cooperation was a prerequisite to his entitlement of immunity promised him pursuant to the April 20th agreement. The fact that the district court determined that he had performed his side of the bargain under that agreement does not entitle Sikes to benefits beyond those which were promised to him. Although Sikes may have hoped that his continued cooperation would ultimately induce the government to extend the terms of his immunity, the government was not responsible for that unfounded expectation. Thus, this is not a case in which promises made in bad faith may constitute trickery so flagrant as to violate a defendant's constitutional rights. *United States v. Battle,* 467 F.2d 569, 570 (5th Cir.1972). Finally, Sikes' cooperation was not related to the charges for which he was prosecuted; nor were statements which Sikes made during the course of his cooperation subsequently used against him. Consequently, Sikes can show no prejudice in this appeal resulting from his cooperation with the government. *See United States v. Donahey,* 529 F.2d

---

**13.** *Calimano* (1978) and *Weiss* (1979), which are opinions of the Fifth Circuit filed prior to October 1, 1981, are binding as precedent in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*).

831, 832–33 (5th Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976).

In sum, the district court's determination that the April, 1987 immunity agreement did not include the year 1986 is based on "a fair, thorough, and objective examination of the evidence," *Calimano,* 576 F.2d at 640, and certainly is not clearly erroneous. *Id.*

## IV. EVIDENTIARY USE AT TRIAL OF PRE–1986 OFFENSES

While Sikes was not prosecuted for any pre–1986 offenses, the government was permitted to introduce at trial evidence relating to 1985 offenses subject to an instruction to the jury that the 1985 evidence was not to be considered as to the charges against Sikes, but only as to the charges against other defendants. Sikes asserts that the immunity he received from the government in exchange for his cooperation protected him from either the direct or indirect use at trial of any evidence of events which occurred between 1981 and 1985.

■ Before the trial commenced, the indictment, as indicated *supra,* was redacted to exclude reference to pre–1986 offenses. Further, in accordance with Karadbil's June 2, 1987 letter, "[n]one of the information obtained from Mr. Sikes, however limited, [was] used against Mr. Sikes," and as per that letter, none of the information provided by Sikes was made known to O'Connor, who prosecuted the case, or Mangiamele, the government's agent-in-chief. Moreover, during the hearing with regard to Sikes' motion to dismiss, Sikes' attorney stated that he was not making any *Kastigar*[14] motion because he believed that the prosecutor had properly insulated herself. In *Kastigar,* the Supreme Court stated that: "Transactional immunity ... accords full immunity from prosecution for the offense to which ... compelled testimo-

ny relates...." *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). In *United States v. Harvey,* 869 F.2d at 1446, Judge Kravitch recently addressed, for the majority of an *en banc* court, the subjects of both transactional and use immunity:

> [T]ransactional and use immunity are coterminous with the fifth amendment privilege [against self-incrimination] in all respects other than their effect on the government in the future. A grant of use immunity prohibits the government from using evidence disclosed either directly or derivatively, while a grant of transactional immunity prohibits the government from prosecuting the witness at any time with respect to the incriminating matters the witness disclosed.

In this instance, the government and Sikes' counsel agree that the prosecutor was properly insulated from all of Sikes' disclosures to the government pursuant to the April, 1987 letter of agreement. Therefore, Sikes' use immunity was not violated. *See generally Kastigar* 406 U.S. at 460–62, 92 S.Ct. at 1664–66. Sikes received the full benefit of the grant of use immunity because the government's evidence relating to the 1985 offenses was derived only from legitimate sources other than his cooperation with the government pursuant to the April, 1987 agreement.

■ As to Sikes' claim that the grant of transactional immunity protected him from the direct or indirect use of any evidence relating to events which transpired prior to 1986, Sikes received the full benefit of his grant of transactional immunity because he was not prosecuted with respect to the incriminating matters which he disclosed. The government's introduction of evidence relating to the 1985 offenses, with an instruction given several times to the jury by the district court that such evidence should

---

**14.** In *Kastigar v. United States,* 406 U.S. 441, 460–61, 92 S.Ct. 1653, 1664–65, 32 L.Ed.2d 212 (1972), the Supreme Court held that once a person is compelled to give testimony under a grant of immunity from the use in any criminal case of such testimony or any evidence derived therefrom, the government bears the burden of

proof, in a subsequent criminal prosecution for an offense to which the compelled testimony relates, to show that the evidence upon which the government relies "is derived from a legitimate source, wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665.

not be considered against Sikes, was not a violation of the terms of the agreement. In the immunity agreement, the government agreed not to *prosecute* Sikes for those offenses, and further agreed not to *use* his disclosures against him. The use of the disclosures by Sikes as evidence against others did not violate the government's agreement with Sikes.[15]

The instructions of the court below to the jury effectively gave to Sikes the protection to which he was entitled. In that context, it is not to be assumed that the jury will be unable to follow the trial court's instructions. *See Lakeside v. Oregon*, 435 U.S. 333, 340 n. 11, 98 S.Ct. 1091, 1095 n. 11, 55 L.Ed.2d 319 (1978).

## V. JOINDER

 Both Sikes and Weaver contend that the joinder of the marijuana and cocaine counts, particularly the conspiracy counts, in the same indictment was improper under Fed.R.Crim.P. 8(b) since the two conspiracies were separate and each of them as defendants was only charged in the cocaine conspiracy. In that regard, both appellants assert that they were prejudiced by that improper joinder because the jury was allowed to hear evidence regarding a marijuana conspiracy in which their co-defendants, but neither of them, were involved. The answer, however, to that contention is that "[s]eparate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions." *United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir.), *cert.*

denied, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980).

Twenty-one defendants were charged in the twenty-nine count indictment in this case. Of those twenty-one defendants charged, all were charged in the cocaine conspiracy and eleven were also charged in the marijuana conspiracy. In addition to those named, two unindicted co-conspirators were purportedly involved in both the marijuana and cocaine conspiracies. Owing to pleas of guilty and the fugitive status of two of the defendants, only two defendants, Bradley and Speck, were confronted at trial with marijuana charges, while all nine of the remaining defendants who went to trial faced cocaine counts.[16]

According to the indictment and the evidence at trial, the marijuana conspiracy which originated in 1983 gradually expanded and switched to cocaine as the drug of popular choice in 1985. However, many of the participants and facts surrounding both of those conspiracies were substantially interrelated.

Joinder of parties and defendants under Rule 8 is designed to promote judicial economy and efficiency. Accordingly, as Judge Roney has written, Rule 8 "is broadly construed in favor of the initial joinder." *United States v. Davis*, 773 F.2d 1180, 1181 (11th Cir.1985). The question of whether initial joinder is proper under Rule 8(b) is to be determined before trial by examination by the trial court of the allegations stated on the face of the indictment.[17] However, whether joinder is improper based upon evidence proffered before or adduced during trial is governed by Rule 14.[18] *United States v. Morales*, 868 F.2d

---

**15.** In *United States v. Van Horn*, 789 F.2d at 1509–10, the defendant asserted that admission against him in a *subsequent* proceeding of certain evidence as prior similar act evidence violated an agreement in which the federal government agreed not to pursue any criminal or civil liability arising out of a prior arrest and conviction for state drug charges in return for the defendant's agreement to forfeit a vessel to the United States. In rejecting that argument, Judge Kravitch noted that "[t]he government did not agree to never use the arrest as evidence in a prosecution for subsequent criminal activity." *Id.* at 1510.

**16.** As indicated earlier in this opinion, *see* note 4, Bradley and Speck have separately appealed.

**17.** Federal Criminal Rule 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

**18.** Federal Criminal Rule 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the

1562, 1567–68 (11th Cir.1989). Thus, we must first look to the indictment in order to determine if appellants' initial joinder was proper under Rule 8(b). *Id.* If improper joinder under Rule 8(b) occurred, reversal is not required if the misjoinder was harmless error. *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). The improper joinder is harmless unless it "results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.,* quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). "Consequently, the question of whether it is proper to restrict a Rule 8(b) inquiry to the indictment is largely academic because in deciding whether reversal is required, assuming the joinder was improper, the reviewing court must necessarily look to the evidence adduced at trial to determine whether the defendant has been prejudiced." *Morales,* 868 F.2d at 1567 n. 3. Thus, in many instances, a reviewing court may "simply [look] to the prejudice component of defendant's claim and only in the rare case where the defendant has demonstrated prejudice will the court be required to address the issue of whether the joinder was actually proper." *Id.*

The face of the indictment discloses that the marijuana conspiracy and the subsequent cocaine conspiracy were improperly joined in this case in the same indictment. The two conspiracies did not overlap temporally; the cocaine conspiracy did not begin until the marijuana conspiracy had ended. The two conspiracies were separately charged in the indictment and the government concedes that they represented separate transactions. Moreover, although eleven of the twenty-one defendants charged in the cocaine conspiracy were also charged in the marijuana conspiracy in the initial indictment, only two of the nine remaining defendants went to trial with regard to the marijuana conspiracy.

Although one of the goals of joinder is to promote judicial economy, a countervailing purpose of Rule 8(b) "is to prevent the 'cumulation of prejudice [growing out of] charging several defendants with similar but unrelated offenses.'" *United States v. Bova,* 493 F.2d 33, 35 (5th Cir.1974), quoting *Cupo v. United States,* 359 F.2d 990, 993 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967). "Rule 8(b) permits joinder of defendants 'if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" *Grassi,* 616 F.2d at 1303. However, as Judge Fay has written, "when ... the connection between different groups is limited to a few individuals common to each but those individuals commit separate acts which involve them in separate offenses with no common aim, then the requisite substantial identity of facts or participants is not present." *United States v. Nettles,* 570 F.2d 547, 551 (5th Cir.1978). Similarly,

> [w]hile criminal acts of several defendants may be similar in nature, these acts cannot be properly joined in a multiple defendant trial if different facts and circumstances must be established to support the alleged violations. But when the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper.

*United States v. Gentile,* 495 F.2d 626, 630 (5th Cir.1974).

In *Gentile,* the Fifth Circuit found that improper joinder had occurred where an illegal sale of LSD charged against one of two jointly tried defendants, but not against the other, occurred nearly three weeks after the sale of PCP in which both defendants were allegedly involved. The court noted that "the sales took place at different locations, the transactions involved different drugs" procured from dif-

court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

ferent sources, and the sale of the LSD was not part of the same "series of acts or transactions" as the sale of the PCP. *Id.* at 630–31. Similarly, in the instant case, the facts underlying the various acts relating to the marijuana conspiracy and to the cocaine conspiracy are not "so closely connected that proof of such facts is necessary to establish each offense," *id.* at 630; nor is there a "substantial identity of facts and participants" involving similar acts in furtherance of a common plan. *Nettles,* 570 F.2d at 551. Thus, the two conspiracies were separate and distinct transactions. Consequently, initial joinder of the marijuana and cocaine conspiracies was improper under Rule 8(b).

Having decided that initial joinder was improper, we must now address whether that error was harmless. *Lane,* 474 U.S. at 449, 106 S.Ct. at 732. From a review of the allegations contained in the indictment and the evidence in the record, we conclude that the error was harmless.

During the trial, Sikes and Weaver joined in pressing co-defendant Fowlkes' pretrial motion to sever the marijuana counts. Initially, the court did not rule on any of those motions prior to trial. However, during trial, the court repeatedly gave cautionary instructions to the jury to consider the marijuana conspiracy evidence only as to co-defendants Speck and Bradley, and not against any of the other defendants. Nevertheless, during the fifth day of testimony, the trial court, over the government's objection, severed the marijuana counts from the cocaine charges, pursuant to Rule 14, and continued the trial on the cocaine counts against Sikes and Weaver and the seven other defendants. In granting the severance motions of defendants Fowlkes, Sikes and Weaver, the district court instructed the jury that the marijuana evidence applied, if at all, only to Speck and Bradley, and then only as similar act evidence. The court further explained how the jury was to consider that similar act evidence.[19] The court also cautioned the

jury not to consider such evidence for the purpose of corroborating or buttressing the testimony of other witnesses.

Sikes and Weaver have not shown how they were prejudiced by the fact that the district court did not earlier sever out the marijuana charges. This is not a case in which "the jury could not follow the trial court's instructions and separate the evidence relevant to each appellant." *United States v. Leavitt,* 878 F.2d 1329, 1340 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989). "Instead, it is presumed that cautionary instructions to the jury to consider the evidence separate as to each defendant will adequately guard against prejudice." *Id.* "Absent evidence to the contrary, we presume that the jury was able to follow the court's instructions and evaluate the evidence against each defendant independently." *United States v. Badia,* 827 F.2d 1458, 1466 (11th Cir.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 275 (1988).

Throughout the trial, the district court gave limiting instructions to the jury concerning the marijuana evidence. Had any prejudice resulted from the jury's hearing the evidence concerning the marijuana loads, it would have had its most prejudicial impact upon Speck and Bradley, the only defendants at trial charged with both the marijuana and cocaine conspiracies. Seemingly, the jurors were able to consider the evidence and follow the court's instruction since they acquitted Speck on the cocaine counts and were unable to return any verdicts as to Bradley. *See, e.g., United States v. Morales,* 868 F.2d at 1571; *United States v. Walker,* 720 F.2d 1527, 1534–35 (11th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).

Finally, the evidence introduced at trial implicating Sikes and Weaver in the cocaine conspiracy was compelling. Given the "overwhelming evidence of guilt" adduced against Sikes and Weaver and for the other reasons set forth *infra* in this

---

**19.** The court instructed the jurors that they could use the marijuana testimony, not to prove that defendants Speck and Bradley did the acts charged in the case, but only to prove state of

mind, *i.e.,* that those defendants acted with the necessary intent and not through accident or mistake.

opinion, the improper joinder was harmless error. *Lane,* 474 U.S. at 450, 106 S.Ct. at 732.

## VI. SUFFICIENCY OF TRIAL EVIDENCE

Appellant Weaver asserts that the government failed to prove that he knew the substance he offloaded and drove was cocaine, and also that there is no evidence that he agreed with anyone to import cocaine or to transport it after it was in the United States. Although he admits that the evidence established the existence of a conspiracy, Weaver asserts that the government did not demonstrate his knowledge of the existence of the conspiracy or his participation in it. We disagree.

In judging the sufficiency of the evidence, we must determine whether the evidence, when viewed in the light most favorable to the government, is such that a reasonable jury could find that it establishes guilt beyond a reasonable doubt as to the appellant.[20]

The sole determination which this court must make is whether a reasonably-minded jury could have found Weaver guilty beyond a reasonable doubt. *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983). Challenges to the sufficiency of the evidence are measured by the following standard:

> "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence."

*Id.,* quoting *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) (footnote omitted).

■ To support a conviction for conspiracy, the government must show beyond a reasonable doubt "that the conspiracy existed" between two or more persons to commit a crime, "the accused knew of it, and that, with knowledge, the accused voluntarily became a part of it." *United States v. Rackley,* 742 F.2d 1266, 1272 (11th Cir.1984). "Close association with a co-conspirator or mere presence at the scene of the crime is insufficient evidence of knowing participation in a conspiracy. However, direct evidence of the elements of a conspiracy is not required." *Vera,* 701 F.2d at 1357 (citations omitted). In fact, "[t]here is 'rarely any direct evidence of an agreement to join a criminal conspiracy.'" *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1982), quoting *United States v. Middlebrooks,* 618 F.2d 273, 278, *modified in part,* 624 F.2d 36 (5th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980). Rather, "[a] defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which further the purpose of the conspiracy." *Vera,* 701 F.2d at 1357.

■ Weaver argues that the government failed to prove that he knew the substance he offloaded and drove was cocaine. However, the evidence adduced at trial supports the conclusion that Weaver, a Florida resident, traveled on two occasions to LaFayette, Louisiana as per arrangements between Weaver and Sikes. Before both offloadings, Weaver and the other offloaders visited the clandestine airstrip. Before the 1985 offload, Weaver, Sikes and all of the other offload crewmembers met, discussed and planned how each vehicle would proceed to the actual landing strip. Each time the plane flew in late at night, it quickly dumped both its duffle bags of cocaine and its extra fuel tanks and immediately took off. Weaver and the other offloaders threw the duffle bags into their vehicles and quickly drove away while others insured that no intruders entered the area. According to Sikes, Weaver was paid $25,000 for each successful offload of cocaine. The evidence supports the finding that Weaver was a trusted participant in the cocaine smuggling and transportation

**20.** *See* note 5, *supra.*

venture and was chosen for his role by the lead defendant, Sikes. That evidence, coupled with the telephone toll records involving Weaver and the other co-defendants, could have led a reasonable jury to the conclusion that Weaver was a knowing and intentional participant.

The jury could also reasonably conclude that in the course of transporting large quantities of valuable, readily marketable cocaine " 'through channels that wholly lack the ordinary protection of organized society, a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders.' " *United States v. Quintero*, 848 F.2d 154, 156 (11th Cir.1988), quoting *United States v. Cruz–Valdez*, 773 F.2d 1541, 1547 (11th Cir.1985), *cert. denied*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). In sum, the jury's verdict is supported in this case by more than sufficient evidence.

## VII. ALLEGED PREJUDICIAL TESTIMONY REGARDING THREATS

During cross-examination of Richard Sommers, an unindicted co-conspirator who was testifying as a government witness, Sommers was asked numerous questions designed to establish that he had violated his plea agreement by lying to the government about his finances. Sommers was asked about a wall built around his home. On re-direct examination, the prosecutor inquired about the cost of the wall and its purpose. Sommers responded that he built the wall "because of threats and beliefs that I have about dangers to my family." The prosecutor then asked: "You didn't receive any specific threats from anybody in this, that's sitting over there, did you?" Answer: "Specific threat?" Defense counsel objected and the court instructed the jury to disregard the question and answer. The prosecutor sought to rectify any adverse inference which may have been drawn from Sommers' answer and the court agreed it was appropriate to clear up the matter. Sommers was brought into the courtroom outside the jury's presence and was asked by the court whether any of the defendants had threatened him directly or indirectly. Sommers responded: "No." A few moments later the same question was asked of Sommers before the jury. Sommers responded that he was not threatened directly, but equivocated as to indirect threats. Immediately, in the presence of the jury, the court cross-examined Sommers with his prior *in camera* response. In addition, Sommers' earlier testimony that none of the defendants had threatened him directly or indirectly was read back to the jury.

That series of questions and answers may well have impeached Sommers and adversely affected the government rather than appellants. In any event, that testimony was hardly very consequential insofar as Sikes or Weaver is concerned when one considers the length of the trial. Even assuming, *arguendo* only, that there was an error as to Sikes or Weaver—and in this court's view there was no such error—a mistrial was not mandated because, in the absence of actual prejudice and in light of the evidence against Sikes and Weaver, the likelihood of substantial impact on the jury was minimal. *United States v. Anderson*, 782 F.2d 908, 916 (11th Cir.1986). Thus, such error, if any, was harmless.

## VIII. SENTENCE ENHANCEMENT

Finally, Sikes contends that the imposition by the court below of an enhanced sentence under 21 U.S.C. § 851 is erroneous because (1) the government failed to give adequate and timely notice of its intent to rely on a prior drug conviction as required by that statute; and (2) the district court neither informed Sikes that he must challenge the validity of any prior conviction underlying the enhancement information nor determined whether Sikes in fact had a prior drug conviction.

Section 851 provides, in pertinent part:

(a)(1) No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless *before trial, or before entry of a plea of guilty*, the United States attorney files an *information* with the court (and serves a copy of such information

on the person or counsel for the person) stating in writing the previous convictions to be relied upon. Upon a showing by the United States attorney that facts regarding prior convictions could not with due diligence be obtained prior to trial or before entry of a plea of guilty, the court may postpone the trial or the taking of the plea for a reasonable period for the purpose of obtaining such facts. Clerical mistakes in the information may be amended at any time prior to the pronouncement of sentence.

. . . .

(b) If the United States attorney files an information under this section, the court shall after conviction but before pronouncement of sentence *inquire* of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

(Emphasis added). The procedural requirements of section 851 apply with respect to any proceeding to enhance a convicted defendant's sentence under both 21 U.S.C. § 841 and § 962, the sentencing provisions applicable to convictions under 21 U.S.C. § 846 and § 963, respectively.

■ This circuit has insisted upon strict compliance with the mandatory language of the procedural requirements of section 851(a) and (b). *United States v. Noland*, 495 F.2d 529, 533 (5th Cir.), *cert. denied*, 419 U.S. 966, 95 S.Ct. 228, 42 L.Ed.2d 181 (1974); *United States v. Cevallos*, 538 F.2d 1122, 1126–27 (5th Cir.1976). This is particularly true with respect to the timing of the government's filing with the court and service on the defendant of an information signifying the government's intent to rely on a prior drug conviction. *Noland*, 495 F.2d at 533. Even when the defendant is not surprised by the enhanced sentence, was aware from the outset that his previous conviction could lead to an enhanced sentence, never challenged the validity of the prior conviction, and admitted it at the

sentencing hearing, the statute prohibits an enhanced sentence unless the government first seeks it by properly filing an information prior to trial. *Id.* "Provision for enhanced sentencing is a legislative decision, and the procedure the legislature prescribes to effectuate its purpose must be followed." *Id.* Significantly, "[t]he doctrine of harmless error does not apply" with respect to failures to follow the statutory scheme of § 851. *United States v. Olson*, 716 F.2d 850, 852 (11th Cir.1983).

■ According to the certificate of service attached to the information notifying Sikes of the government's intention to rely upon a prior drug conviction for purposes of sentence enhancement, Sikes' counsel was personally served with the information on June 13, 1988, prior to selection of the trial jury. However, the information itself reveals a filing date of June 17, 1988, which was the fourth day after the start of trial. In addition, the record reflects that the information was docketed on June 17, 1988. If filing of the information took place after the commencement of the trial, it would appear to run afoul of the mandatory requirement that the information be filed with the court *before* trial. But, in this case, the transcript of June 13, 1988 reveals that, prior to jury selection, the following statement to the court by the prosecutor. "Ms. O'Connor: Just as a housekeeping matter, also the government is filing an information on Mr. Sikes, notice of a prior conviction, in order to double the maximum penalty. Defense counsel and Mr. Sikes have received a copy." Neither at that time nor at any time prior to sentencing did Sikes note any objection as to the timing or form of the government's notice. By personally serving Sikes and his counsel with a copy of the information prior to trial, and by advising the court orally that it was filing an information for purposes of sentence enhancement, the government complied with the mandatory requirements of section 851.

■ Sikes further contends that his sentence was improper because the district court failed to inquire whether he affirmed

or denied that he had a prior drug conviction, as alleged in the information, pursuant to 21 U.S.C. § 851(b). Indeed, a review of the sentencing transcript reveals that the district court did not specifically ask Sikes whether he had in fact been previously convicted. However, that is understandable when considered in context. During his opening statement to the jury, counsel for Sikes admitted that Sikes had a prior drug conviction. In addition, during the sentencing proceeding, the court reviewed with Sikes' attorney the Pre–Sentence Report (PSI) prepared by the probation officer. In discussing the prior arrests and convictions contained in the PSI, which included the prior convictions for conspiracy to import marijuana and conspiracy to possess with intent to distribute marijuana contained in the government's information (Case No. 82–73–Cr–SMA), counsel for Sikes took the position that the "court should not take into consideration anything other than convictions." In advocating that the prior arrests should be stricken, Sikes' counsel argued that the PSI should only contain "the number of convictions that's referred to." Later in the proceeding, when the court referred to Sikes being convicted when he was out on bond, and spoke of a proposed doubling of Sikes' sentence, Sikes' counsel raised no objection. Not only did Sikes fail to object to the prior convictions contained in the government's information and in the PSI, but, by implication, he agreed that the prior convictions stated in the PSI were correct. Thus, far from challenging the prior convictions, Sikes' counsel all but affirmed Sikes' previous drug convictions.

The convictions which formed the basis of the enhancement were more than five years old. Sikes was convicted of conspiracy to import marijuana and conspiracy to possess with intent to distribute marijuana on January 31, 1983.[21] The government's enhancement information which relied on those convictions was filed on June 13 or June 17, 1988, more than five years after those convictions. As such, challenge to

the validity of Sikes' convictions was barred by § 851(e):

> No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.

A trial court is not required "to adhere to the rituals of § 851(b) where a defendant, as a matter of law, is precluded from attacking the conviction forming the basis of the enhancement information." *United States v. Nanez*, 694 F.2d 405, 413 (5th Cir.1982), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). Thus the trial court's imposition of an enhanced sentence as to Sikes, pursuant to 21 U.S.C. § 851, would not, in any event, be subject to successful attack in this appeal even if that court had not done all it was required to do under the statute.

## IX. CONCLUSION

For the reasons stated in this opinion, the convictions and sentences of Sikes and Weaver are AFFIRMED.

---

**21.** *See* Judgment and Conviction Order for defendant Thomas Sikes dated January 31, 1983, 82–73–Cr–SMA, Docket No. 1450. Sikes' convic-

tion was affirmed by this circuit in *United States v. Van Horn, supra.*