[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 13, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-4200

_____

D.C. Docket No. 96-00976-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EFRAIN DOMINGUEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 13, 2000)**

Before ANDERSON, Chief Judge, CARNES and RONEY, Circuit Judges.

CARNES, Circuit Judge:

After having been convicted by a jury on multiple counts involving participation in a cocaine distribution organization and mortgage fraud, Efrain Dominguez appeals, contending that the district court erred: 1) by permitting the mortgage fraud-related charges to be joined with the drug-related charges under Rule 8(a) of the Federal Rules of Criminal Procedure; and 2) by failing to grant a mistrial or, in the alternative, by failing to adequately investigate indications that the jury had engaged in premature deliberations. We are unpersuaded by either contention and affirm his convictions.

## I. BACKGROUND

Efrain Dominguez was charged by superseding indictment with twenty-eight counts of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846; conspiracy to money launder, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A) and (B); use of a telephone facility in commission of a felony, in violation of 21 U.S.C. § 843(b) and (d); and mortgage fraud, in violation of 18 U.S.C. § 1014.[1] The charges break down into two general sets of crimes – one set involving participation in a cocaine

---

[1] The indictment also sought forfeiture of any property constituting, or derived from, any proceeds of Dominguez's violations of 21 U.S.C. § 846, 21 U.S.C. § 843(b) and (d), 21 U.S.C. § 1956(h), and 21 U.S.C. § 1956 (a)(1). The government dismissed the forfeiture counts at the end of the trial, and they are not at issue in this appeal.

distribution organization (Counts 1-24), and the other involving mortgage fraud (Counts 25-28).

Before trial, Dominguez filed a motion to sever the mortgage fraud-related charges pursuant to Rule 8(a) and Rule 14 of the Federal Rules of Criminal Procedure. The government opposed severance on the ground that the drug-related charges and mortgage fraud-related charges were properly joined under Rule 8(a) as "acts or transactions connected together or constituting parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The government argued that proof of the drug-related charges provided the motive and necessity for the mortgage fraud-related charges. The district court denied Dominguez's motion for severance.

The case was tried before a jury in June 1998. On the eighth day of the nine-day trial, before the government had finished presenting its case, the court received a note from a juror asking to be excused. The court questioned the juror in the presence of both sides, and it became apparent from the juror's answers that at least some of the jurors had already been discussing whether Dominguez was guilty. The district court denied Dominguez's counsel's request to be permitted to question the juror himself, and it denied his request for a mistrial on the basis of premature deliberations.

Before the jury returned a verdict, it sent a note to the court explaining that it was unable to reach a decision on the five money laundering counts (Counts 2-6). Over an objection by Dominguez, the court decided to accept a partial verdict on the counts upon which the jury was able to agree. The jury found Dominguez guilty on all counts except the five money laundering counts. The government then dismissed those five counts.

Following the jury's verdict, Dominguez moved for a judgment of acquittal, or in the alternative, for a new trial based in part upon the court's pretrial denial of his severance motion and in part upon the evidence of premature deliberations by the jury. The district court denied Dominguez's motion. The court sentenced Dominguez to 188 months of imprisonment and five years of supervised release.

On appeal, Dominguez argues that the district court erred by denying his motion to sever the drug-related charges and mortgage fraud-related charges under Rule 8(a) of the Federal Rules of Criminal Procedure, and by failing to grant a mistrial or, in the alternative, to adequately investigate the indications that the jury had started deliberating the case before the closing instructions or even the completion of the evidence.[2]

---

[2]   Dominguez also contends that the district court's refusal to permit him to re-cross examine a witness about evidence he argues was introduced during re-direct examination of that witness violated the Confrontation Clause of the Sixth Amendment. We find no merit to that contention and affirm the district court's ruling on it without further discussion.

## II. DISCUSSION

### A. Whether the District Court Erred by Denying the Motion to Sever the Drug-Related Charges and Mortgage Fraud-Related Charges as Improperly Joined Under Rule 8(a)

Dominguez contends that the drug-related charges and the mortgage fraud-related charges in the indictment were misjoined under Rule 8(a), and for that reason the district court erred in denying his motion to sever the two sets of charges.[3]  Rule 8(a) allows "[t]wo or more offenses [to] be charged in the same indictment . . . in a separate count for each offense if the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a

---

[3] In the district court Dominguez moved for severance on grounds of improper joinder under Rule 8(a) and also sought it as relief from prejudicial joinder pursuant to Rule 14. However, on appeal he has emphatically abandoned any Rule 14 arguments and issues, choosing to stake his position solely on Rule 8(a). In his reply brief, Dominguez goes so far as to chide the government for discussing Rule 14, saying on the opening page of his reply brief that: "The fundamental flaw in the government's argument on this issue is that the government apparently does not understand the difference between Federal Rules of Criminal Procedure 8 and 14. The government's entire argument is premised on the standards applicable to denial of severance under Rule 14, even though Appellant has only raised the denial of his motions under Rule 8." Appellant's Reply Br. at 1; see also id. at 9 n.4 (arguing that the government could not take any comfort from Dominguez's failure to raise his desire to testify as to only one set of the charges as a basis for error on appeal, because "the defendant's desire to testify as to only one of the joined charges is a basis for severance only under Rule 14, not Rule 8(a)."). Like Dominguez, we will not discuss Rule 14. See generally United States v. Wilson, 894 F.2d 1245, 1252 (11th Cir. 1990) (evaluating alleged violations of Rule 8 and Rule 14 separately because the analysis involves different standards).

common scheme or plan." Fed. R. Crim. P. 8(a). In <u>United States v. Weaver</u>, 905

F.2d 1466 (11th Cir. 1990), this Court explained that:

> Rule 8 is broadly construed in favor of the initial joinder. The question of whether initial joinder is proper under Rule [8] is to be determined before trial by examination by the trial court of the allegations stated on the face of the indictment. . . . Thus, we must first look to the indictment in order to determine if appellants' initial joinder was proper under Rule [8]. If improper joinder under Rule [8] occurred, reversal is not required if the misjoinder was harmless error. The improper joinder is harmless unless it results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict.

<u>Id.</u> at 1476-77 (analysis of Rule 8(b)) (internal quotations and citations omitted).

Dominguez argues that the drug-related charges and mortgage fraud-related charges were misjoined because nothing on the face of the indictment tied the two groups of charges together, and the evidence presented at trial with respect to the two groups of charges did not overlap. We agree with Dominguez that, looking solely to the four corners of the indictment, there is no explicit connection between the groups of charges. Drug distribution charges and mortgage fraud charges are not of the "same or similar character." Nor do the charged offenses appear to be "based on the same act or transaction." The counts containing the mortgage fraud charges make no reference to the preceding counts containing the drug charges or to any drug-related activity.

However, when Dominguez moved before trial for severance of the drug-related and mortgage fraud-related charges, contending that they were misjoined under Rule 8(a), the government responded that the charges were properly joined for two reasons. First, the government stated that "proof of the [drug-related charges] provides the motive and necessity for the [mortgage fraud-related charges.]" Second, the government submitted that "both sets of charges will involve the presentation of the same evidence to the jury."

The first reason proffered by the government, taken alone, furnishes the necessary relationship between the two groups of charges: The charged offenses were "acts or transactions connected together or constituting parts of a common scheme or plan," which makes joinder proper under Rule 8(a). According to the government's theory of the case, which was later supported by the trial evidence, Dominguez submitted fraudulent income tax returns when applying for mortgage loans in order to conceal the fact that his income had been derived from drug activity. Regardless of whether both sets of charges involve the presentation of the same evidence, the fact that one illegal activity provides the impetus for the other illegal activity is sufficient to constitute a common scheme for joinder purposes.

In United States v. Kopituk, 690 F.2d 1289 (11th Cir. 1982), the appellants argued that the tax offenses charged against them in the indictment, which included

7

filing false income tax returns, were improperly joined under Rule 8 with the non-tax offenses, which included racketeering, conspiracy to engage in racketeering, extortion, and receipt of kickbacks in connection with a labor matter. Id. at 1295, 1312. This Court concluded that joinder under Rule 8(b) was proper.[4] We reasoned that:

> [t]he tax offenses were . . . part of a series of acts committed in furtherance of the overall conspiracy. In the case of the unreported income received by [two of the appellants], the filing of false income tax returns operated to maximize the benefits enjoyed as a result of their participation in the conspiracy and, of course, facilitated their efforts to avoid detection of the criminal enterprise. As for the fraudulent deductions claimed on behalf of [a corporation involved in the offenses], the preparation of false corporate income tax returns enabled [other appellants] to minimize the adverse financial impact of the illegal payoffs they were making in order to acquire . . . business.

Id. at 1314. See also United States v. Yefsky, 994 F.2d 885, 895 (1st Cir. 1993) ("[T]he tax fraud and mail fraud counts could be joined [under Rule 8(b)] because some of the unreported income was the fruit of the mail fraud scheme."); United States v. Wirsing, 719 F.2d 859, 862-63 (6th Cir. 1983) (drug charges were properly joined under Rule 8(a) with tax evasion charges when the government "contend[ed] that the income that was not reported on [defendant's] return for the

---

[4] Rule 8(a) governs the joinder of multiple offenses, and Rule 8(b) governs the joinder of multiple defendants. Fed. R. Crim. P. 8; see also United States v. Gentile, 495 F.2d 626, 628 n.2 (5th Cir. 1974). Rule 8(a) establishes a "more lenient standard" for joinder than Rule 8(b), Gentile, 495 F.2d at 628 n.2, and for the purposes of our discussion of Rule 8(a), the governing principles are the same.

years in question was derived from his illegal activity in the conspiracy to distribute drugs" and proof of tax evasion was indirect net worth method). But cf. United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996) (charges for misbranding shrimp were not properly joined under Rule 8 as part of "a common scheme or plan" with tax fraud charges because "it was pure happenstance whether the overstated expenses [on the fraudulent tax returns] happened to overstate legal income or illegal income [which was derived from increased profits due to misbranding of shrimp] of the [c]ompany."); United States v. Halper, 590 F.2d 422, 429 (2nd Cir. 1978) (Rule 13 consolidation) (charges were not properly joined as "connected together or constituting parts of a common scheme or plan" despite the government's argument that "[the defendant's] scheme to defraud the Medicaid system produced the income which he then failed to report on his personal income tax returns" because "the government concede[d] that the sums charged in the income tax evasion indictment were not the same funds embraced in the Medicaid fraud indictment."). Under our Kopituk decision, the drug-related and mortgage fraud-related charges in this case were properly joined under Rule 8(a).

We reach that conclusion with full awareness that this Court has repeatedly said that whether joinder is proper under Rule 8 is to be determined by examining the allegations in the indictment alone. See, e.g., United States v. Morales, 868

9

F.2d 1562, 1567-68 (11th Cir. 1989) (concluding that joinder of parties was proper under Rule 8(b), because the indictment named all defendants-appellants in a single conspiracy count: "[W]e will look only to the indictment in order to determine if the appellants' initial joinder was proper under Rule 8(b)."); United States v. Wilson, 894 F.2d 1245, 1253 (11th Cir. 1990) (concluding that joinder of parties was proper under Rule 8(b), because offenses as alleged in the indictment were factually similar and those allegations showed a substantial overlap of participants: "We recently established that we examine only the allegations on the face of the indictment to determine if the appellants' initial joinder was proper under Rule 8(b)." (citation omitted)); United States v. Weaver, 905 F.2d at 1476.[5] If that principle applied here, Dominguez would have a much stronger case for misjoinder under Rule 8(a), because the indictment in this case does not explicitly allege any connection between the two groups of charges, although it may implicitly indicate a connection. Even assuming that the indictment in this case standing alone does

---

[5]    In Weaver, we held that the initial joinder of parties was improper under Rule 8(b) because the defendants-appellants were charged only in a cocaine conspiracy. The indictment had also charged a marijuana conspiracy, which, as the government conceded, represented a separate transaction. After examining the face of the indictment, we explained that the "conspiracies did not overlap temporally" and only two of the nine defendants who went to trial were charged with the marijuana conspiracy. See Weaver, 905 F.2d at 1477. Notwithstanding the misjoinder, the convictions were affirmed on harmless error grounds. See id. at 1478. The misjoinder was rendered harmless because the trial court severed the marijuana charges from the cocaine charges during the fifth day of testimony, and gave cautionary instructions to the jury when it proceeded with the trial of the cocaine charges. See id. at 1478.

not indicate a sufficient connection between the two sets of charges to justify joinder under Rule 8(a), joinder was still proper. We say that because after examining our decisions we do not believe the "indictment only" rule applies to invalidate joinder, instead of to justify it.

In the cases where we have relied on the indictment alone to establish the propriety of initial joinder, the defendant-appellant was arguing that evidence adduced during trial showed that joinder was improper even though under the allegations of the indictment alone joinder would have been proper. See, e.g., Morales, 868 F.2d at 1567 (challenging joinder of parties under Rule 8(b) when one of defendants was acquitted on conspiracy count); United States v. Fernandez, 892 F.2d 976, 984-85 (11th Cir. 1989); United States v. LaSpesa, 956 F.2d 1027, 1031-32 (11th Cir. 1992); United States v. Kabbaby, 672 F.2d 857, 860-61 (11th Cir. 1982).[6] Dominguez, on the other hand, argues that the indictment shows that

---

[6] In Fernandez, the defendant-appellant "argue[d] that the government's proof [at trial] established two conspiracies instead of the single conspiracy charged in the indictment" and that joinder of the multiple defendants was improper under Rules 8 and 14. Fernandez, 892 F.2d at 984. We stated that the propriety of joinder under Rule 8(b) was to be determined "by examining the allegations contained in the indictment," and that the indictment alleged a single conspiracy. Id. at 985. Accordingly, we concluded that the defendant-appellant's Rule 8 "claim probably would be meritless" and that a "misjoinder or prejudicial joinder claim based on evidence adduced at trial ... falls under Rule 14 . . . ." Id.

In LaSpesa, the defendants-appellants contended that the trial evidence was insufficient to show one conspiracy, and that the district court thus erred by denying their Rule 8 misjoinder motion and their Rule 14 severance motion. LaSpesa, 956 F.2d at 1031. We stated that joinder was proper "[b]ecause the indictment sufficiently alleged that all of the defendants were

11

joinder was <u>improper</u>, even though looking to the government's representations before trial, which were borne out in the evidence presented during trial, we know that joinder was <u>proper</u>.

The rationale behind the indictment only rule makes sense when the indictment evidences the requisite connection between the charges, but the evidence at trial takes an unexpected turn that vitiates the basis for joinder. As we have explained:

> The difficulty we see in allowing a court to analyze a Rule [8] claim based on the evidence adduced at trial is that it permits a reviewing court to conclude that initial joinder was improper based on information that was not and could not have been known to the prosecutor at the time the indictment was brought. We do not believe that it is appropriate to make a Rule [8] determination that initial joinder was improper simply because the government failed to prove all of the facts alleged in the indictment.

<u>Morales</u>, 868 F.2d at 1568 (Rule 8(b) analysis). That reasoning shows not just why the indictment only rule exists, but also why that rule is not applicable to situations

---

involved 'in the same series of acts or transactions constituting an offense or offenses.'" <u>Id.</u> at 1032.

In <u>Kabbaby</u>, the defendant-appellant challenged the propriety of joinder of one count, upon which he was convicted, with multiple other counts involving other defendants, upon which he was acquitted. He argued that the record as it pertained to the count upon which he was convicted was devoid of any connection to the other defendants. <u>Kabbaby</u>, 672 F.2d at 859-60. We held that joinder was proper based upon the face of the indictment, stating that "[the] failure of the jury to convict [the defendant-appellant] of participating in the broader conspiracy of which the [single count] was a part does not require retroactive invalidation of the joinder." <u>Id.</u> at 860-61.

when the evidence proffered by the government before trial or adduced during trial shows that initial joinder was proper even though the indictment may not have explicitly stated the connection between the charges. It is enough that when faced with a Rule 8 motion, the prosecutor proffers evidence which will show the connection between the charges. See United States v. Halliman, 923 F.2d 873 (D.C. Cir. 1991).[7] If the indictment fails to show and the prosecutor fails to proffer a sufficient basis in the expected evidence to justify joinder, then a severance should be ordered.[8]

---

[7] The rule in the D.C. Circuit is that "the government need not demonstrate the propriety of its joinder decisions on the face of the indictment. . . . Rather, the government need only present evidence before trial" sufficient to establish that joinder is proper. Halliman, 923 F.2d at 883 (citations omitted). In Halliman, the government joined the appellants in an indictment pursuant to Rule 8(b), but did not indict the appellants in any common counts. Despite that failure, the court found joinder proper because the government, in a pre-trial hearing, presented evidence of a connection between the charged offenses. See id. at 883-84.

In the course of reaching that conclusion, the D.C. Circuit pointed to our circuit as an example of one which examines only the allegations in the indictment to determine the propriety of joinder under Rule 8(a), and thought that we disagreed with its rule permitting the government to proffer or present sufficient evidence at any time before trial. See id. at 883 n. 7. The D.C. Circuit is only partially correct in its interpretation of our law. As we explain today, when the defendant attempts to show joinder is improper by pointing to later evidence, we look only to the face of the indictment. However, when the defendant attacks joinder as improper based on the indictment but later evidence shows that joinder is proper, we look beyond the face of the indictment.

[8] Rule 8 "requires only that the government 'allege,' not prove, the facts necessary to sustain joinder." Halliman, 923 F.2d at 883. The failure of the government to prove those facts at trial does not mean joinder was improper, provided the allegations are made in good faith. See id.; Morales, 868 F.2d at 1568 ("We do not believe that it is appropriate to make a Rule 8(b) determination that initial joinder was improper simply because the government failed to prove all of the facts alleged in the indictment."); Gentile, 495 F.2d at 632 (reading Schaffer v. United States, 362 U.S. 511, 80 S. Ct. 945 (1960), as holding that "even though initial joinder of

Here, the evidence showed that joinder was proper. The government's response to Dominguez's motion to sever explained why the two groups of charges were properly joined: Concealing income from the drug activity was the motive for the mortgage fraud. The evidence at trial supported that position, as the government's closing argument pointed out to the jury.[9] In other words,

offenses prior to trial was based solely on the alleged existence of a conspiracy, the subsequent failure to prove the conspiracy at trial did not constitute misjoinder" under Rule 8); Kabbaby, 672 F.2d at 860-61 ("Contrary to defendant's argument, failure of the jury to convict him of participating in the broader conspiracy of which [the drug transaction upon which he was convicted] was a part does not require retroactive invalidation of the joinder."). The indictment only rule is inconsistent with any notion that failure to prove a good faith representation about what the evidence will show establishes improper joinder. In any event, in this case the government proved at trial the basis it had proffered for the joinder.

[9] The pertinent part of the government's closing argument follows:

> Now, let's talk for a minute about the false statement counts, government's – the counts in the indictment were counts 25 through 28.
> The false statement counts tell you a lot about this defendant, about Efrain Dominguez. The evidence on those counts shows that he made false statements to these banks in an effort to influence the banks to give [him] loans. . . .
> This is the 1990 return. Here is the 1989 return that he submitted to the banks. ... And you heard testimony that these are forgeries. The IRS has never seen them. Never heard about these tax returns. . . .
> So why does he do this? Why? It is very simple why he does this. If he goes into this bank showing the kind of money he has made from cocaine trafficking, four years out of law school, worth $3 and a half million, you show that kind of money and those kind of assets that he has got, with his true legitimate income of 20 grand or 30 grand, he is in big trouble. . . .
> So what does he do? Well, he creates plausible tax returns, plausible returns that don't – that will pass the laugh test. You look at them, you go, oh, okay, he makes 75 or 85, okay. That's, you know, that makes sense with this income.
> And that is really the problem with cocaine, folks. You make so much money that it is impossible to justify what you have. . . .
> This is proof beyond any reasonable doubt that he committed these mortgage frauds. . . .

14

Dominguez invites this Court to ignore both the government's response to his motion to sever, and the realities of the evidence and argument made at trial, all of which established the propriety of joinder. Because the indictment only rule upon which Dominguez relies does not apply in the context in which he seeks to invoke it, we decline his invitation. Because we hold initial joinder under Rule 8(a) was proper, it is unnecessary to discuss whether Dominguez showed actual prejudice.[10]

### B.  Whether the District Court Abused Its Discretion by Failing to Adequately Respond to Allegations That Jurors Had Engaged in Premature Deliberations

Dominguez also argues that he was denied his constitutional right to a fair trial by an impartial jury, because the jury began deliberations even before the government finished presenting its case.  Dominguez contends that the district court

---

[10]  An alternative way to approach Dominguez's claim would have been to look first to whether there was any prejudice from the joinder, assuming that it was improper.  This Court has stated:

> [T]he question of whether it is proper to restrict a Rule [8] inquiry to the indictment is largely academic because in deciding whether reversal is required, assuming the joinder was improper, the reviewing court must necessarily look to the evidence adduced at trial to determine whether the defendant has been prejudiced.  Thus, in many instances, a reviewing court may simply look to the prejudice component of defendant's claim and only in the rare case where the defendant has demonstrated prejudice will the court be required to address the issue of whether the joinder was actually proper.

Weaver, 905 F.2d at 1477 (analysis of Rule 8(b)) (internal quotations and citations omitted). Because we have concluded that joinder of charges was not improper, we need not decide whether he could have established prejudice if joinder had been improper.

15

abused its discretion by denying his motion for a mistrial on this ground, or in the alternative, that it did so by not investigating the alleged jury misconduct more thoroughly to determine the extent of the prejudice to him.

Under the Sixth Amendment, every defendant in a criminal prosecution has a right to trial by "an impartial jury." U.S. Const. amend. VI. A jury's impartiality is endangered by colloquy among jurors about the case prior to the beginning of formal deliberations. See United States v. Yonn, 702 F.2d 1341, 1345 n. 1 (11th Cir. 1983). The danger is that "such conversations may lead jurors to form an opinion as to the defendant's guilt or innocence before they have heard all of the evidence, the arguments of counsel, and the court's instructions." Id. That is why juries are typically instructed at the beginning of the trial and periodically throughout it not to discuss the case among themselves until permitted to do so at the completion of the evidence and closing instructions.

The problem in this case came to the attention of the district court on the eighth day of the nine-day trial, before the government had finished presenting its case. The court received a note from a juror stating: "I do not feel that I can adequately fulfill my duties as a juror and ask that I be excused." Counsel for both sides suggested that the court bring the juror out and ask her what she meant by the

16

note.  The court agreed and  interviewed the juror on the record in the presence of

counsel for the parties. That interview went as follows:

> The Court: Good morning . . . .  I have received your note. While don't tell me anything specific about your thoughts about this case, but will you explain to me what you mean by the note?  Why do you feel you can't continue as a juror?
>
> Juror: I had not realized before that it would be – that there would be much – as much entailed in terms of making a judgment.  And I feel inadequate to make – or to be a part of this process.  I do.
>
> The Court: . . . Is there something in particular – again, not about this case, but that causes you to have that feeling?
>
> Juror: It has something to do with some of the discussion that has been going on in the jury room, and I just see things quite differently, and I feel that it can be detrimental to the process.
>
> . . . .
>
> The Court: So you believe you may disagree with others, is that what you are saying?
>
> Juror: Yes. . . .
>
> . . . .
>
> The Court: Well, laying aside the other jurors, what is it about yourself that causes you to –
>
> Juror: Because I suppose that my level of doubting of – my level of questioning is a little more than the average level.
>
> . . . .

The Court: . . . What I am trying to respond to is your feeling that you are not up to the task, that part of your sentiment.

Juror: Well, I suppose – I think in terms of the discussion that has gone on so far, I may say things so differently that perhaps I am questioning my own interpretation and my own ability to interpret.

Following that colloquy with the juror the court had a side bar conference with the attorneys and solicited their recommendations about how to proceed. Dominguez's attorney requested that the court ask the juror what deliberations had been going on, and suggested that if the jury had been deliberating contrary to the court's instructions, "then we are moving for a mistrial. That's what it sounds like to me." Counsel for the government argued that nothing the juror had said indicated any deliberations had taken place although there might have been some "small talk," which he said was inevitable, and he urged the court not to inquire further about whether deliberations had occurred. Dominguez's counsel argued that for the juror to say that her opinions differed from those of others on the jury obviously meant that there had been some deliberations, because "why else would she be finding that she – her viewpoints are different than everybody else or a majority of people unless they have been discussing them?"

When the court inquired as to the parties' positions about excusing the juror from any further service, counsel for the government urged the court to remove her because she had indicated during voir dire that she might have a problem with

18

sitting in judgment of another person, and her latest comments established that she did have a problem in that respect. Dominguez's attorney argued against removing the juror, but moved for a mistrial on the ground that the jury had not followed the court's instructions to refrain from deliberating.

After reading some decisions relating to the matter, the district court decided to question the juror further. That additional questioning and the answers it elicited are as follows:

> The Court: I want to talk further with you about the note you sent me and why you believe you can't – why you are asking to be excused.
>
> Have you come to a conclusion about this case at this point or do you believe you can wait until the end of the case and form your decision?
>
> Juror: Others have –
>
> The Court: Let me finish. Let me ask you a question.
>
> Can you wait until the end of the case to decide your view and come to your conclusion?
>
> Juror: Definitely.
>
> The Court: And you can be fair and impartial to both sides?
>
> Juror: I am working on it.
>
> The Court: The opinion and view of each juror is important and deserves to be considered. What is it that causes you to believe that you can't perform as a juror in this case?

19

Juror: It is a question of the final analysis of guilt and innocence and the disposition of someone's life that is a very big deal. And I will have to live according to my conscience if a decision is made incorrectly, if I have somehow done something, made a wrong decision, I will be living with that decision.

The Court: What is it about yourself that causes you to believe that you can't do that in this case?

Juror: I feel that the prosecution is very, very heavy-handed so I am slightly biased in the other direction, if that is quite – I feel that I have always been for the underdog. . . . And it is the underdog that I am generally attempting to do something for. So I have to work against that bias. I knew that to start out with.

The Court: But you yourself just told me that you felt you could wait until the end of the case, deliberate with other jurors and come to a conclusion. What is it that causes you to believe you can't do that, if there is anything?

Juror: I think – okay. I am questioning my ability to interpret the facts because what I am hearing – we do have others as a sounding board, and I am questioning my own ability to be objective. That is what I am questioning at this point. I am questioning my subjective coloration of what is going on.

. . . .

The Court: Is this an internal struggle with your own mind or is this being caused by anyone else, any other juror, for example?

Juror: There is apparently general consensus —

The Court: Again, I don't want to know their deliberations, but I may need to know what people have said to you that is causing this problem in your mind. Let me – Have there been discussions about the facts of this case among the jurors?

20

Juror: Well, certainly.

The Court: Have some jurors said to you they have come to a conclusion?

. . . .

Juror: I think that – from what I have seen, I think a fairly general consensus is already there.

The Court: Are you interpreting what people are saying or are you –

Juror: It is fairly clear what people are –

The Court: From comments people have made to you?

Juror: Yes. In the room.

. . . .

The Court: . . . What I want [to] know is, whether or not you can continue to deliberate and come to that conclusion both yourself and as a group. I need to know that in terms of you. I also need to know whether or not the jury has jumped the gun and begun deciding the case now as opposed to waiting until the end of the case when you can talk to each other and come to a conclusion.

Juror: It is a very, very conscious jury. And again, I feel that, perhaps, there has been a little – everyone is waiting until the end. However, we talk. And everyone there is very conscientious. Everyone is very anxious to, I think, deliberate with all honesty.

. . . .

The Court: Has anyone told you they have made up their minds?

Juror: Not, per se.

The Court: Do you believe you can continue to deliberate and come to a conclusion both individually and with the other members of the jury?

Juror: Everyone is working very hard on this case. There is a definite – this is a really interested jury.

The Court: That question was directed to you. Can you do that?

Juror: To the best of my ability, but I don't think I am seeing things quite –

The Court: Well, that is part of the process. At times people may not see things differently. But what we ask as a juror, will wait until the end of the case, will hear all the evidence, will decide themselves, will communicate with other jurors to reach a group decision if possible . . . . And the question is, can you do that?

. . . .

Juror: I can definitely do that. I just want justice to be served as well. And if I am incapable of – for whatever reason of – I had wanted to disqualify myself because I wasn't certain that I could be objective.

The Court: You mean at the outset?

Juror: No, at the outset I was fairly convinced I could be.

The Court: Where are you now at this stage?

Juror: Yes.

The Court: But my question now is, do you believe you can continue and wait until the conclusion of the case to come to an internal decision, deliberate with the others and participate in the decision of this jury?

Juror: Yes.

Dominguez's counsel then requested permission to question the juror further, arguing that the additional questioning the court had conducted made it clear that there had been some deliberations. He said he wanted to ask questions about the dialogue that had been going on among the jurors, what deliberations had occurred, and what conclusions had been reached. Counsel for the government opposed any further inquiry, pointing out that the juror had said that everyone was waiting until the end to decide the case and that no one had told her they had made up their minds. He suggested that the juror had simply been drawing inferences from "signals or body language or who knows what, or offhand remarks that might be one way," but she had unequivocally told the court that the jury had not begun deliberating and that no one had made up their minds as far as she knew. The court agreed, explaining:

> I asked those questions deliberately and I asked her that specific question, and she responded that they had not.
>
> So I am concluding, based on my inquiry, that there is not – there is – and I think I went pretty far in terms of comments. I don't believe there has been first misconduct. I also believe that this jury can continue to serve and that there is not a basis to excuse her based on this record. And I don't believe that it would be appropriate to allow inquiry by counsel.

23

The court did ask counsel for Dominguez whether he had any additional questions he would like the court to ask the juror. Counsel said he wanted the juror questioned further about what discussion had been going on, including the decisions or conclusions other jurors had reached and told her about. The court declined to ask the juror any more questions about that, saying: "She said there had been no decisions made. The jury was waiting." The court believed that it had made adequate inquiry.

Counsel for the government then asked the court to remove the juror from any further service on the grounds that she had indicated she was biased against the prosecution. The court declined, reiterating that "she explained her processes but can wait until the end of the case" to come to a conclusion.

Counsel for Dominguez once again moved for a mistrial on jury misconduct grounds, arguing that the jury had violated the court's instructions by deliberating and discussing the case and making decisions inappropriately. The government again opposed that motion, and the court denied it. The court told the juror she should continue her service, but instructed her not to discuss with other jurors the questioning that had occurred.

The jury was brought back in the courtroom and proceedings continued. Neither side requested that the court immediately instruct the jury about not

24

deliberating before the end of the case, and it did not do so. However, approximately fifty transcript pages later, and before the jury was allowed to leave the courtroom again, the court told the jury that they were going to break for lunch, and it also instructed them as follows:

> It is important, as I indicated to you at the outset, to wait until the end of the case until we begin – until you begin your deliberations. Keep an open mind to any additional evidence until you get the instructions and argument of counsel and then deliberate.
>
> So I ask you not to discuss the case again with anyone else or each other until we get to that point in the process.

There were no objections to that instruction or any request for further instructions on the subject. At the end of that trial day, the court instructed the jurors that it was very important they not discuss the case with anyone.

The most salient aspect of the law in this area is the breadth of discretion given to judges who are called upon to deal with the possibility of juror misconduct. District court judges deal with jurors on a regular basis, and those judges are in the trenches when problems arise. The problems that present themselves are seldom clearly defined and a number of variables have to be considered. There are often no obviously right or wrong answers to the questions that arise. For all of these reasons, a trial judge is vested with broad discretion in responding to an allegation

of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct such as premature deliberations, instead of external misconduct such as exposure to media publicity. See Grooms v. Wainwright, 610 F.2d 344, 347 (5th Cir. 1980); Yonn, 702 F.2d at 1344-45; United States v. Williams, 716 F.2d 864, 865 (11th Cir. 1983); United States v. Cuthel, 903 F.2d 1381, 1382 (11th Cir. 1990). In a number of decisions we have held that when a jury problem involves the possibility of internal misconduct, the trial judge's "discretion extends even to the initial decision of whether to interrogate the jurors." Yonn, 702 F.2d at 1345; accord United States v. Harris, 908 F.2d 728, 733-34 (11th Cir. 1990); Cuthel, 903 F.2d at 1382-83. It is difficult, if not impossible, to reconcile with those decisions Dominguez's position that the district court in this case abused its broad discretion by not interrogating the juror further about the nature and extent of any discussions that had occurred about the case. The Yonn, Harris, and Cuthel decisions foreclose any holding that the court's questioning of the juror in this case was so inadequate as to be an abuse of discretion. The same reasoning and conclusion apply to the court's refusal to permit counsel for Dominguez to question the juror further.

We turn now to whether the district court abused its broad discretion by not granting a mistrial on the basis of what the juror said in answer to the questions that

the court did ask. It is apparent from the juror's answers to the judge's questions that there had been some discussion of the case among at least some of the jurors. However, when asked specifically whether "the jury has jumped the gun and begun deciding the case now as opposed to waiting until the end of the case," the juror said that "perhaps, there has been a little – everyone is waiting until the end," but "we talk." From comments made to her she thought "a fairly general consensus is already there," but she did not say it had been arrived at after deliberations instead of independently by each juror on the basis of the evidence heard so far. The juror assured the judge that she could wait until the conclusion of the case and after deliberations to reach a decision.

Based upon the juror's answers, the district court found that there had not been any juror misconduct, and we cannot say that conclusion, to the extent it includes fact findings about whether any discussion that had occurred was extensive, is clear error. We reiterate, what we have observed in the past, that the district court is in a better position to evaluate credibility, see Grooms, 610 F.2d at 347, as well as "the mood at trial and the predilections of the jury." Harris, 908

F.2d at 734; accord United States v. Bertoli, 40 F.3d 1384, 1393-94 (3rd Cir.

1994).[11]

While we conceivably might have followed a different course and even

arrived at a different result than the district court did if we had been presiding over

the trial of this case, we were not. The whole point of discretion is that there is

range of options open, which means more than one choice is permissible. The

broader the discretion, the greater the range of choice and the less room for reversal.

As we have explained before, "under the abuse of discretion standard of review

there will be occasions in which we affirm the district court even though we would

have gone the other way had it been our call. That is how an abuse of discretion

standard differs from a de novo standard of review." In re Rasbury, 24 F.3d 159,

168 (11th Cir. 1994). Such a standard means that a trial court has "a range of

---

[11] In Harris, the defendants alleged that a juror sitting in the jury box said "do it to him good" as a witness for the prosecution was taking the stand to testify. Harris, 908 F.2d at 733. The court chose not to investigate the remark. See id. at 734. On appeal, we held that the court had not abused its discretion in declining to investigate because the meaning of the remark was ambiguous and the district court was in a better position to judge whether the "statement . . . reflect[ed] serious juror contamination." Id.

In Grooms, the defendant's mother allegedly overheard a remark by one juror at the close of the state government's case indicating that the juror had concluded the defendant was already guilty, but she did not report the remark until after the jury rendered a guilty verdict. See Grooms, 610 F.2d at 346-48. The court questioned the mother at a hearing attended by defense counsel, and denied the defendant's motion for a new trial. See id. at 347-48. We recognized that "[a]fter hearing the mother's testimony and observing her demeanor, the judge was in a good position to evaluate her credibility," and held that the denial of the defendant's motion for a new trial was not an abuse of discretion. Id.

choice . . . so long as that choice does not constitute a clear error of judgment." Id. (internal marks and citation omitted). We cannot say that, all things considered, the district court's decision not to grant a mistrial was a clear error of judgment.

Two facts about this case reinforce our conclusion. First, the court repeatedly instructed the jurors, both before and after its investigation into the alleged jury misconduct, that Dominguez was presumed innocent, that the jury should not discuss the case until the evidence was completed, and that their verdict must be based only upon the evidence presented at trial. When it concluded that the jury should continue to serve, the court in essence concluded that the jury was capable of correcting any misbehavior, of following the court's instructions from that point on, and of properly evaluating the evidence. As we said in Williams, 716 F.2d at 865, "[t]he district court was in the best position to determine whether . . . the jury's discussion of the case prior to submission could be cured from error by instructions as given."

Second, the jury did reach a split verdict, convicting Dominguez of the drug-related and mortgage fraud-related charges but failing to reach a verdict on the money laundering charges. That split verdict evidences that the jury necessarily must have considered the charges individually and assessed the strength of the

evidence as to each charge. The careful weighing of evidence inherent in a split verdict makes the verdict itself "evidence that the jury reached a reasoned conclusion free of undue influence and did not decide the case before the close of evidence." Cuthel, 903 F.2d at 1383.[12] As the Third Circuit has acknowledged, "when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." United States v. Resko, 3 F.3d 684, 690 (3rd Cir. 1993).[13] For all these reasons, we hold that the district court did not

---

[12] In Cuthel, the defendants alleged that an anonymous telephone call and letter written by a juror to the prosecutor, both received after the verdict, indicated jury contamination. See Cuthel, 903 F.2d at 1382. We concluded, among other things, that the letter did not indicate that premature deliberations occurred. We then stated that the jury's split verdict, acquitting the defendants of some counts but convicting on others, was further evidence that the court's decision that the jury was free of undue influence and did not deliberate prematurely was not clearly erroneous. See id. at 1383.

[13] In Resko, on the seventh day of a nine-day trial, a juror told a court officer that, despite the district court's instruction to the contrary, the jury had been discussing the case. See Resko, 3 F.3d at 687. The district court "summoned the jurors en masse, informed them of the problem, and then gave each a written questionnaire" asking if they had discussed the facts of the case and if they had formed an opinion as to the guilt or innocence of the defendants. Id. at 688. The Third Circuit concluded that, despite the district court's broad discretion in handling allegations of jury misconduct, its inquiry "was inadequate to ... determin[e] whether prejudice resulted from the jury misconduct." Id. at 691. Thus, it vacated the defendants-appellants' convictions on two counts and remanded for a new trial. See id. at 695-96.

Although we agree with the Third Circuit's statement in Resko that the violation of the proper process for jury decision-making does not necessarily mean that the jury has based its decision on inappropriate factors, see id. at 690, for reasons apparent from our previous discussion in this opinion, we disagree with its ultimate conclusion that the district court was obligated to conduct further investigation under those circumstances. It seems to us that the

30

abuse its discretion by failing to grant a mistrial or by failing to investigate possible jury misconduct more thoroughly.

## VI. CONCLUSION

AFFIRMED.

---

Third Circuit applied in Resko an understanding of broad discretion that is different from our own. Be that as it may, that circuit appears to have broadened the definition of "broad discretion" in this area and retreated somewhat from Resko's stringent standard for investigation into jury misconduct. In Bertoli, 40 F.3d 1384, the district court, when it learned of possible premature deliberations, chose to interview only four of the jurors. Id. at 1390. It dismissed three of the jurors, see id., and denied the defendant's request that it interrogate the other jurors. See id. at 1395. Limiting the "holding [in Resko] to the facts of that case, facts which [it] thought – and still think[s] – unlikely to recur," the Third Circuit held that there was "no abuse of discretion in the trial court's handling of the allegations of jury misconduct . . . ." in Bertoli. Id. at 1396.

31