NOTICE

Decision filed 02/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241125-U

NO. 5-24-1125

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 23-CF-420 |
| | ) | |
| ROBERT MUSSON, | ) | Honorable |
| | ) | Robert E. McIntire, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore* and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the trial court had no duty to question a juror who cried during some testimony and where the State's questioning of a child witness and remarks in closing argument were not improper, we affirm the defendant's convictions.

¶ 2    On August 4, 2023, the defendant, Robert Musson, was charged by indictment with three counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)). Two of those counts alleged that the defendant, who was 17 years of age or older, committed an act of sexual contact with a minor, G.S., who was under 13 years of age when the acts were committed. One count alleged that the defendant committed an act of sexual contact with a minor, K.J., who was under 13 years of age when the acts were committed. On February 15, 2024, the

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

defendant was charged by indictment with four additional counts of predatory criminal sexual assault of a child. *Id.* Two of those additional counts alleged that the defendant, who was 17 years of age or older, committed an act of sexual contact with a minor, G.S. The other two additional counts alleged that the defendant, who was 17 years of age or older, committed an act of sexual contact with a minor, K.J. On August 13, 2024, a jury trial commenced on six total counts from both indictments.[1] The defendant was convicted on all six counts and was sentenced to life in prison. Following the denial of his motion for new trial, the defendant timely appealed. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      We recite only those facts relevant to the issues on appeal. On July 4, 2023, Jessica S., the mother of alleged victim G.S., was contacted by a relative who said the defendant had abused G.S. The defendant is G.S.'s step-grandfather. On July 7, 2023, G.S. talked to his older sibling, K.S., who informed Jessica that G.S. "told her more stuff and it was really bad." On July 8, 2023, G.S.'s father contacted Danville police about the allegations.

¶ 5      On July 11, 2023, G.S. was interviewed by child advocate specialist Chelsey Hembree at the Vermilion County Children's Advocacy Center (CAC). G.S. told Hembree that he had not slept in four days and was very tired. He did not want to talk more, so Hembree asked if he wanted to draw. G.S. drew a picture of himself, his mother, and his sisters. Hembree told G.S. that sometimes children come to the CAC to talk to her about "good touch" and "bad touch." When asked if he understood, G.S. nodded. G.S. then drew a picture of a person and pointed to the butt. He wrote the word "bad," which he said meant bad touch. Hembree asked G.S. if there was anywhere else on his body that was not okay to touch, and he said, "I know some, but he didn't touch me there."

---

[1] Count V was nol-prossed before trial.

G.S. drew a picture of a body with a "d" but said Grandpa did not touch him there. G.S. wrote the word "abuse." Hembree showed G.S. an anatomically correct drawing of the front and back of an unclothed male and asked G.S. to circle where Grandpa touched him. G.S. circled the butt on the anatomical drawing and stated that he did not know if Grandpa touched him "here," circling the genitals. When asked where he was when Grandpa touched him, G.S. said they were in Grandpa's room when Grandpa touched his butt. He wrote "room" and "lock" on the picture he had drawn and said that Grandpa had locked the room. G.S. was unsure how long ago this happened but said that it happened more than once. When asked what Grandpa used to touch his butt, G.S. circled the hand on the anatomical drawing.

¶ 6      G.S. later met with a detective from the Danville Police Department. G.S. told the detective that when he was a "little boy," while in the shower with Grandpa, Grandpa would wash his back and touch G.S.'s genitals and butt. Grandpa told him not to tell anyone. G.S. made a slashing motion across his own throat and said that he kept this secret for a long time because Grandpa had said that. G.S. stated no one was home when Grandpa touched him. He also said that he touched Grandpa's butt and genitals "because he made me." G.S. said Grandpa also made him "suck the d" more than one time. G.S. said he got dizzy while it happened, and he did not like the taste and would use a lot of soap to wash his mouth out.

¶ 7      Prior to trial, the State filed notice of intent to introduce the CAC interview and statements G.S. made to his parents and to police officers, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2022)). On July 17, 2024, the trial court held a hearing pursuant to section 115-10 and found the CAC video to be admissible. The State also sought to admit evidence of the defendant's sexual assault of each minor (G.S. and K.J.) as propensity evidence. K.J. is the defendant's great-niece, who disclosed abuse by the defendant

3

during the investigation concerning G.S. The State argued that the defendant's assaults of G.S. and K.J. were proximate in time and factually similar. The trial court granted the State's motion to admit this evidence, and the CAC video was published to the jury.

¶ 8 At trial, Jessica testified that her mother was married to the defendant, and she and her three children, including G.S., lived with her mother and the defendant for a period in 2021. She said that until 2023, she trusted the defendant around children, even allowing him to take them swimming at his boss's house at times. In 2023, Jessica received a Facebook message from Brandy Miller, a relative, about the defendant reportedly abusing K.J. and G.S. Jessica's daughter, K.S., then spoke to G.S., who told her about the defendant touching him in the shower. Based on that conversation, Jessica and her husband took G.S. to the Danville Police Department to report a "sexual assault."

¶ 9 Officer Michael Stephens testified that he met with Jessica, her husband, and G.S. on July 9, 2023, at the Danville Police Department. G.S. told Officer Stephens that the defendant would rub his butt in bed, made G.S. "suck his dick," and would "watch nasty videos have Vaseline and toilet paper with him." G.S. said he was afraid of the defendant after that, because if he would take a nap with him, "it would hurt." G.S. told Officer Stephens this happened about four years ago; he did not tell anyone before, because the defendant threatened to kill him if he did.

¶ 10 Detective Chase Whorrall from the Danville Police Department testified that he was present, through a two-way mirror, during G.S.'s interview at the CAC. He also discovered through his investigation that K.J. had made allegations against the defendant and was hesitant to speak with police. Detective Whorrall said that he met with G.S. after his CAC interview due to more detailed disclosures, and he testified to that conversation, which was audio and video recorded. That video was admitted into evidence and published for the jury. In that video, G.S. drew stick

4

figures and pointed to male anatomically correct drawings, indicating the defendant put his "pee-pee" in his butt. G.S. also drew a showerhead, with a stick figure of himself and the defendant and said, "I felt something weird in my butt." During a break in the interview, G.S. drew a large "X" through his drawing and blacked out his and the defendant's face with a marker.

¶ 11     During the State's case, outside the presence of the jury, defense counsel made a motion to excuse juror Alverez-Mendoza. Counsel stated, "She's been crying during multiple testimonies. She seems to have made a decision already before hearing all of the evidence presented, and it's also prejudicing other members of the jury." The court denied the motion, stating, "That's not an unusual reaction to such dramatic testimony as we've had, and I don't consider it to be indicative of any such mindset as counsel suggests." Defense counsel did not ask the court for permission to question the juror nor was a request made for the court to conduct an *in camera* interview of this juror.

¶ 12     K.S. testified that her young brother, G.S., trusted and confided in her, so she talked to him about the defendant. Around July 4, 2023, G.S. told her that the defendant touched him, and she told her parents. About two months later, K.S. "could tell that [G.S.] was kind of upset and so [she] asked him if there was anything wrong, and then he told me more stuff." G.S. said the defendant touched him when they were at the defendant's boss's pool, and all of this happened only when he was alone with the defendant. G.S. told K.S. that when he would take a nap with the defendant, the defendant would touch his butt, and "white stuff" would come out. He said that the defendant told him there were cameras in the house, and if G.S. told anyone what happened, he would kill G.S.

¶ 13     G.S. testified, now 10 years old, that he used to live in Danville, Illinois, with his parents. He said that his grandpa is the defendant, and that the defendant "put his pee-pee in [G.S.'s]

5

mouth," more than once. He said that "white stuff" came out of the defendant's penis, which was "disgusting." G.S. said he had asthma, so it was really hard to breathe when the defendant's penis was in his mouth. G.S. testified that the defendant put his penis in his butt in the defendant's bedroom and in the shower. He did not tell anyone before, because the defendant threatened to kill him.

¶ 14    During G.S.'s testimony, the following colloquy occurred between the State and G.S.:

"Q.  What kind of memories do you have of [Grandpa] back when you were living in Danville?

A. Fun times.

Q. Okay. And then at some point did the fun times stop?

A. Yes.

Q. Do you remember what happened to make them stop? Was it something that you did or that he did to you?

A. He did.

Q. Okay. Now describe it however you want, but tell us what happened.

A. He put his pee-pee in my mouth.

Q. He put his pee-pee in your mouth?

A. Uh-huh.

Q. Okay. Do you remember, did this happen one time or more than once?

A. More times.

Q. More than once?

A. Yes.

Q. Okay. Do you remember, did the taste—how did it taste?

6

A. Disgusting.

Q. Okay. Did anything come out of his pee-pee?

A. White stuff.

Q. Okay. What was happening to you while this was—while his pee-pee was in your mouth? Could you breathe?

A. No.

Q. Tell us, how did you—what was going on with you? Did you feel some kind of way?

A. Disgust.

Q. Okay. And tell us what was going on with your breathing.

A. I have asthma.

Q. Yeah. And was it hard to breathe with that in your mouth?

A. Yes.

Q. Were you far away from him or were you close to him?

A. Close.

Q. Did he ever put his pee-pee anywhere else on your body?

A. My butt.

Q. Okay. Do you remember where that happened?

A. Bedroom.

Q. Okay. Would you—so did you have, like—did you stay over at his house?

A. Yeah.

Q. You were in his bedroom?

A. Yeah.

7

Q. Okay. And where did he put his pee-pee then?

A. Huh?

Q. Where did he—what happened while you were taking these naps?

A. I wasn't in the room when I was asleep.

Q. Okay. Where were you?

A. In the living room or with my mom.

Q. Okay. So you weren't asleep but did he—did [Grandpa] put his pee-pee anywhere else on your or in your when you were living in Danville?

A. Only in my mouth and my butt.

Q. Okay. Do you know where you were when he put it in your butt?

A. In the shower."

¶ 15    Brandy Miller, K.J.'s mother, testified that the defendant is K.J.'s great-uncle. Miller testified that K.J. "didn't like to be around" the defendant. In June 2020, Miller overheard K.J. telling her sisters that the defendant had touched her, and Miller contacted the police. K.J. was too "scared" to talk to the police at first, but eventually, in January 2024, K.J. spoke with Detective Whorrall with the Danville Police Department.

¶ 16    K.J. testified that she was born in 2009 and grew up in Danville near the defendant. She would see the defendant at family events and at holidays. She testified that when she was eight years old, at a family party, she went into the kitchen to get food, and the defendant began tickling her. He "tickled around" her "breast area" and laughed. The defendant also touched her "private part," and when asked by the State how he did that, K.J. said it was "just kind of like—like a shove kind of thing" with his finger into her vagina. She told him to stop and hoped it would never happen again. K.J. stated that, two years later, on Christmas Eve, she sat on the defendant's lap. She was

wearing a dress, and he touched under her "private part" again. She testified he touched her under her dress, over her underwear, and with the same kind of pressure as before. He stopped because someone came into the room. K.J. also testified to a third incident where she was watching TV when the defendant came into the room smelling of alcohol. After asking her about school and being "goofy," the defendant then grabbed her and flipped her over onto her stomach and became "tense." She testified that he took off her pants and underwear and took off his pants and underwear. She said "he put his penis in [her] butt" and told her if she told anyone, he would hurt her. K.J. testified that she went to the bathroom after and noticed blood on her underwear, coming from "[her] butt."

¶ 17    Hembree testified to her qualifications as a child interviewer and described the process of a CAC interview. Both G.S.'s drawings and the anatomically correct drawings were admitted into evidence and published to the jury. The State rested. The defendant made a motion for directed verdict, which the trial court denied.

¶ 18    The defendant testified that he is K.J.'s great-uncle and G.S.'s grandfather. He denied putting his penis in G.S.'s butt or mouth, putting his finger in K.J.'s vagina, or putting his penis in K.J.'s butt. He said that his bedroom door does not even lock, and defense counsel admitted into evidence and published photos of the defendant's bedroom door.

¶ 19    The defendant stated that he used to give Jessica and her kids rides from Peoria to Danville, on the condition that they contribute gas money. On one occasion, Jessica did not have gas money, so he refused to give them a ride. He testified that he believed this made Jessica mad. On cross-examination, the defendant acknowledged that the "argument" about the car ride was "months" before July 2023. The following colloquy then occurred between the State and the defendant:

"Q. And it set them off or something? What are you trying to say here?

9

A. Yes. Jessica's oldest son got into a car wreck and he was put in the hospital, and I went over there and seen him on a Saturday morning, and Jessica was there, and she called me on Sunday asking for a ride back to Peoria. I asked if her if she had gas money, and she said no. I was like, well, I can't help you then.

Q. So what? Why are you telling us that? What does that have to do with anything?

A. This whole case. This whole case, it came after—after I told her no, a few weeks later this case came up."

¶ 20 The jury was instructed as to the definition and elements of each charged offense with Illinois Pattern Jury Instructions, Criminal (IPI Criminal), No. 11.103 and IPI Criminal No. 11.104. The jury instructions also included IPI Criminal No. 1.01, "The Functions Of The Court And The Jury"; IPI Criminal No. 1.01B, "Implicit Bias"; IPI Criminal No. 1.02, "Jury Is Sole Judge Of The Believability Of Witnesses"; and IPI Criminal No. 1.03, "Arguments Of Counsel." The jury found the defendant guilty of three counts of predatory criminal sexual assault of a child as to G.S. and three counts of predatory criminal sexual assault of a child as to K.J.

¶ 21 The defendant filed a motion for a new trial, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court should not have admitted other-crimes evidence or statements from the 115-10 hearing; (3) the trial court should have excused the juror who cried; (4) the trial court should have granted the motion for a directed verdict; and (5) the verdict was a result of insufficient deliberation, resulting from passion, bias, and prejudice of the jury against him. The trial court denied this motion. The defendant was sentenced to life in prison. The defendant timely appeals.

¶ 22                                    II. ANALYSIS

¶ 23    The defendant raises three main arguments on appeal. First, he argues that the trial court

erred by not excusing or questioning juror Alverez-Mendoza, who was crying during some of the

testimony. Second, the defendant contends that defense counsel was ineffective for failing to object

to leading questions asked by the State during G.S.'s testimony. Third, the defendant asserts that

defense counsel was ineffective for failing to object during the State's closing argument when it

misstated the evidence, failed to include an element of the offense, and commented on the

credibility of the victims and the defendant. We address each argument in turn.

¶ 24                                 A. The Crying Juror

¶ 25    The defendant argues that the trial court abused its discretion when it failed to "make any

inquiry, or excuse, a juror who cried throughout multiple testimonies." Matters relating to jury

selection and management, including issues of possible jury misconduct, are within the discretion

of the court. *People v. Runge*, 234 Ill. 2d 68, 105 (2009). Because the question of whether a juror

is impartial is a matter for the trial court, a trial court's ruling will be disturbed only if it is contrary

to the manifest weight of the evidence. *People v. Strawbridge*, 404 Ill. App. 3d 460, 466 (2010).

A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly

evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.

*People v. Peterson*, 2017 IL 120331, ¶ 34. The trial court's discretion in the realm of jurors extends

to the initial decision of whether or not to interrogate a juror. *Runge*, 234 Ill. 2d at 105 (citing

*United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000)).

¶ 26    The defendant relies upon *People v. Chatman* in support of his argument that the trial court

abused its discretion by failing to question juror Alverez-Mendoza. *People v. Chatman*, 49 Ill.

App. 3d 1034 (1977). In *Chatman*, both the trial court and counsel questioned a juror who had

11

begun to cry during testimony. *Id.* at 1036. The *Chatman* court held that the trial court's decision denying the challenge to the juror was clearly not contrary to the manifest weight of the evidence. *Id.* Here, the defendant argues that *Chatman* placed a duty upon the trial court to, at the very least, question juror Alverez-Mendoza on whether or not she could remain fair and impartial. However, *Chatman* did not impose a duty upon a trial court to *sua sponte* make any inquiry or allow counsel to do so. The defendant fails to cite any case, and we are not aware of any, that requires a trial court to question a juror who has been observed to make a visceral reaction to emotional or gruesome testimony. Taking the defendant's argument to its logical conclusion, any time a juror is observed reacting to testimony, it would trigger a duty for the trial court to recess the trial and conduct an *in camera* interview of that juror. What sort of inquiry would be required? Would both defense counsel and the State be entitled to question that juror? What limits, if any, would there be on the questions to be asked? Such a Pandora's box is best left securely locked.

¶ 27 The defendant chose to have a jury trial. That choice carries no guarantee that guilt or innocence will be decided by 12 automatons. That choice does guarantee that whether the State successfully carries its burden of proof beyond a reasonable doubt will be decided by 12 human beings with, excepting sociopaths, emotions. The defendant's argument on this issue can be readily dispatched by a single sentence from the State's brief: "A defendant is entitled to an impartial jury, not an *unfeeling* jury." (Emphasis in original.)

¶ 28                                  B. Leading Testimony

¶ 29 The defendant next argues that he should be granted a new trial, because the State improperly led G.S.'s testimony. No objection was made during the testimony, and the defendant failed to include this issue in his motion for new trial. As a result, the defendant has forfeited this

12

argument. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, the defendant must both state an objection at trial and include the issue in a written posttrial motion).

¶ 30 When a defendant fails to preserve a claim of error, we may review the claim only if the defendant establishes plain error. The plain error doctrine allows a reviewing court to reach errors that affect a defendant's substantial rights in only two circumstances: (1) where a clear or obvious error occurred that was "prejudicial," meaning the evidence is so closely balanced that the guilty verdict may have resulted from the error and not the evidence; or (2) where a clear or obvious error occurred that "affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Bush*, 2023 IL 128747, ¶ 71; *People v. Herron*, 215 Ill. 2d 167, 177 (2005). The threshold inquiry in any plain-error analysis is whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); see also *People v. Williams*, 2022 IL App (2d) 200455, ¶ 104 ("If clear or obvious error did not occur, no plain-error analysis is necessary.").

¶ 31 The defendant cherry-picks a portion of G.S.'s direct testimony to support his leading question argument. The State's brief includes a more complete portion of G.S.'s testimony, which provides context. First, we find that the highlighted testimony was not leading. Second, even if it could be construed as such, a prosecutor is allowed to ask leading questions of child witnesses. *People v. C.H.*, 237 Ill. App. 3d 462, 474-75 (1992); *People v. Ridgeway*, 194 Ill. App. 3d 881, 885 (1990). "Allowing leading questions, when examining children of tender years, is clearly within the discretion of the trial court." *Ridgeway*, 194 Ill. App. 3d at 885. Therefore, no error occurred during the State's direct examination of G.S.

13

¶ 32                      C. The State's Closing Argument

¶ 33    Next, the defendant makes several claims of error regarding the State's closing argument: (1) the State incorrectly recounted the facts relating to K.J.'s disclosure to law enforcement; (2) the jury was not told that it must find the defendant committed the crimes for sexual gratification; and (3) the prosecutor remarked on the defendant's credibility and argued the victims should be believed.

¶ 34    "Prosecutors are allowed wide latitude in closing argument and the propriety of their comments are within the trial court's discretion." *People v. Sutton*, 260 Ill. App. 3d 949, 960 (1994) (citing *People v. Graca*, 220 Ill. App. 3d 214, 221 (1991)). "The prosecution may base its closing argument on the evidence presented or reasonable inferences therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight inconsistencies in the defendant's argument." *Id*. A closing argument must be viewed in its entirety, and any challenged remarks must be viewed in the context of the entire argument as well as the trial court's instructions. *People v. Williams*, 2022 IL 126918, ¶ 44. To merit reversal, a prosecutor's improper comments must be of "substantial magnitude" when viewed in light of the entire argument and the record. *Sutton*, 260 Ill. App. 3d at 960.

¶ 35    Here, the defendant complains that during closing argument the prosecutor stated that K.J. spoke to Detective Whorrall first in July 2023 and again in January 2024. The record shows that K.J. did not follow through with her interview with Detective Whorrall in July of 2023, when she refused to get out of the car at the police station. She did in fact meet with Detective Whorrall in January of 2024. Our supreme court has held that

> "[a]n error in closing argument is not a typical error in that it does not involve the admission of inculpatory evidence or the rejection of exculpatory evidence but rather commentary on

14

the evidence that has been presented. That is why juries are told that closing arguments are not evidence and 'any statement or argument made by the attorneys which is not based on the evidence should be disregarded.' " *Williams*, 2022 IL 126918, ¶ 40 (quoting IPI Criminal No. 1.03).

When considered in the context of the State's entire closing argument, its one misstatement regarding the dates of K.J.'s interview did not represent clear or obvious error.

¶ 36    Next, the defendant complains that the prosecutor did not include the element of "for the purpose of sexual gratification" in its closing argument, when defining the elements it must prove beyond a reasonable doubt to sustain a conviction of predatory criminal sexual assault. However, the jury received complete verbal and written jury instructions that included the required element of sexual gratification. IPI Criminal No. 11.103 and IPI Criminal No. 11.104. The fact that the State missed the opportunity to highlight that element during closing argument is not clear or obvious error.

¶ 37    The defendant's final complaint is that the prosecutor referred to G.S. and K.J. as credible and said the defendant's version of events was not believable. The defendant concedes these comments were made in rebuttal closing argument, after defense counsel had questioned the believability of the child victims, by arguing G.S. gave "many inconsistent stories" and emphasizing the passage of "four years" between the alleged abuse and the disclosure. The State reminded the jurors that they were the "judges of the credibility of the witnesses," instructing them to "listen to [G.S.'s and K.J.'s] answers" as opposed to the defendant. The State said, "That's the jumping off point and it's clear that two of the three were telling the truth and one of them was desperately lying." "While it is improper for the State to place the integrity of the State's Attorney's office behind the credibility of a witness, the State may discuss the witnesses and their

15

credibility and is entitled to assume the truth of the State's evidence." *People v. Pryor*, 170 Ill. App. 3d 262, 273 (1988). Accordingly, the State's comments in closing argument here are not clear or obvious error.

¶ 38 Because we have found no error in either the State's direct examination of G.S. or its closing argument, there can be no plain error or cumulative error. For that reason, the defendant's ineffective assistance of counsel argument also fails. To establish that counsel was ineffective, a defendant must show (1) that trial counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We find that trial counsel was not objectively unreasonable by failing to object to witness questioning and closing argument that were not error. "[I]t is not necessary to evaluate both prongs of the *Strickland* test if the defendant makes an insufficient showing on one." *People v. Waldrop*, 2025 IL App (5th) 230085-U, ¶ 11.

¶ 39                                   III. CONCLUSION

¶ 40    For the foregoing reasons, we affirm the defendant's convictions.

¶ 41    Affirmed.

16